**MALDEN MILLS INDUSTRIES, INC., Plaintiff,**

v.

**ILGWU NATIONAL RETIREMENT FUND, et al., Defendants.**

**Civ. A. Nos. 88–0681–C, 91–10290–C.**

United States District Court,
D. Massachusetts.

July 1, 1991.

Marc L. Goodheart, E. Randolph Tucker, Hill & Barlow, Boston, Mass., for plaintiff Malden Mills Ind., Inc.

John Francis McMahon, Angoff, Goldman, Manning, Pyle, Wagner & Hiatt, Boston, Mass., Philip W. Horton, Arnold & Porter, Washington, D.C., for defendant ILGWU Nat. Retirement Fund.

MEMORANDUM

CAFFREY, Senior District Judge.

This case is before the Court on the defendants', ILGWU National Retirement Fund and certain of its trustees (collectively the "Pension Fund" or "Fund"), motions for summary judgment, and the plaintiff's, Malden Mills Industries, Inc. ("Malden" or "Employer"), motion for summary judgment pursuant to Fed.R.Civ.P. 56(c). Plaintiff brought this action against the Pension Fund for declaratory relief seeking a determination of the date it withdrew from the Fund for purposes of assessing withdrawal liability under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.A. § 1001 *et seq.* (1978), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").[1] Malden contends it withdrew from the pension plan in 1986, and the Fund argues that Malden withdrew in 1987. The Fund counterclaimed to collect unpaid pension contributions and withdrawal liability which the Fund claims Malden owes to it under the MPPAA. In August 1988, by Order of this Court, the issue of withdrawal liability was submitted to arbitration, and on December 31, 1990, the arbitrator issued a final award in favor of the Fund. The Fund now asks this Court to confirm the arbitrator's final award and seeks summary judgment with respect to Malden's delinquent contribution claims. Malden seeks modification of the arbitrator's award. Jurisdiction of this Court is founded under ERISA, 29 U.S.C.A. §§ 1132 and 1451. For the reasons stated below, the defendants' motions for summary judgment should be granted, and the plaintiff's motion for summary judgment should be denied.

I.

For the purpose of these motions, the relevant undisputed facts are as follows.[2] The defendant, ILGWU Retirement Fund, is a pension fund maintained pursuant to collective bargaining agreements ("CBA's") between the Union and Malden.[3] The Fund is a multiemployer plan as defined by ERISA under 29 U.S.C.A. §§ 1002(37)(A) and 1301(a)(3) (1980). A number of employers in the garment industry, including Malden, contribute to the Fund on behalf of their present employees, and benefits are currently being paid to retired and disabled workers, as well as survivors of deceased workers.

Malden engages in fabric manufacturing and, as a signatory of the CBA's with the Union, made contributions to the ILGWU Fund from 1954–1986. On November 30, 1986, the parties' then existing three-year CBA expired and negotiations commenced for a new one. Meanwhile, Malden and the Union agreed on an interim basis to extend the old CBA, including the obligation to contribute to the Fund, on a day-to-day basis. This "Extension Agreement," which was dated November 26, 1986 and made effective December 1, 1986, indicated that negotiated changes in the retirement plan "shall not be retroactive unless the parties otherwise agree."[4] The interim agreement

---

1. Malden also seeks a refund or credit against its withdrawal liability for contributions paid to the Fund from January 1, 1986 through November 30, 1986.

2. The parties have submitted a joint "Statement of Undisputed Facts" consisting of 60 paragraphs of admitted facts. For the purposes of this decision, this Court adopts as findings of fact all of the facts stipulated therein. Only the facts essential to this decision, however, will be recited in this opinion.

3. At all times relevant to this lawsuit, Malden, whose principal place of business is in Lawrence, Massachusetts, employed approximately 850 employees who are members of one or the other of two bargaining units, whose exclusive representatives are the International Ladies Garment Workers Union, Locals 311 and 533.

4. The Extension Agreement provided as follows:
The Company and the Union agree to a day-to-day extension of their existing collective bargaining agreement. This extension may be terminated by either party twenty-four (24) hours after delivery of written notice of intent to so terminate delivered by one party to the other party.
Any change(s) in a successor collective bargaining agreement shall be retroactive to December 1, 1986 unless the parties in such successor agreement provide a different effective date for such change(s).
It is understood and agreed that the effective date(s) of all changes to the collective bargain-

remained in effect for five and one-half months (the "hiatus period"). During this hiatus period, Malden made no contributions to the Fund.

Then on May 15, 1987, Malden and the Union executed a new three-year CBA covering the period from December 1, 1986 through November 30, 1989.[5] The pension/retirement provisions of the new CBA, retroactive to December 1, 1986, did not require Malden to make contributions to the ILGWU Fund for the five and one-half month hiatus period. The new CBA also did not require Malden to make any further contributions to the ILGWU Fund during the balance of the three-year period, but rather required Malden to contribute to a new single-employer retirement plan.

Malden and the Union also executed an "Amendment of the 1983–86 Collective Bargaining Agreement" which purported to amend Malden's obligations to contribute to the Fund under the expired 1983–86 CBA. This amendment provides that Malden's "obligation to contribute to the ILGWU National Retirement fund shall cease for all periods from and after January 1, 1986." [6]

After the Fund was notified that the new CBA was finalized and ratified by the Union membership, the Fund issued an estimated withdrawal liability assessment in the amount of $5,131,025 based on a withdrawal date of May 15, 1987, the date the new CBA was executed. On November 3, 1987, when updated figures became available, the Fund revised this withdrawal liability assessment to $5,217,126. In addition, the Fund by letter dated September 3, 1987, demanded payment of unpaid pension contributions for the hiatus period from December 1, 1986 to May 15, 1987, in the amount of $643,129.80. Thereafter, a dispute arose between Malden and the Fund as to the date of Malden's withdrawal from the retirement plan. The Fund maintained that Malden withdrew on May 15, 1987. Malden, on the other hand, argued that it withdrew on January 1, 1986 or December 1, 1986.

After the Fund rejected Malden's alleged date of withdrawal, on March 21, 1988, Malden gave notice that it was initiating withdrawal liability arbitration, then filed suit in this Court (C.A. No. 88–0681–C) seeking a declaratory judgment that it had withdrawn from the Fund in 1986, that it was entitled to a credit for the eleven months of contributions made to the Fund, and that it was not liable for any delinquent contributions during the five and one-half month hiatus period from December 1, 1986 through May 15, 1987. By Order dated August 5, 1988, the Court stayed the 1988 action pending arbitration of "all claims regarding the determination of [Malden's] withdrawal liability, including but not limited to the determination of when [Malden] withdrew from the ILGWU National Retirement Fund and whether [Malden] failed to make a timely request for arbitration." [7]

In an interim award dated September 15, 1989, the arbitrator concluded that Malden had initiated arbitration in a timely manner as required under 29 U.S.C.A. § 1401(a) (1980).[8] On December 31, 1990, after a

---

ing agreement are nonetheless subject to negotiation and agreement between the Company and the Union. Any changes in any drug plan, dental plan, retirement plan, and medical insurance coverage shall not be retroactive unless the parties otherwise agree.

5. On May 11 and May 15, 1987, Malden and the Union executed a new CBA, Settlement Agreement, Amendment of the 1983–86 CBA, Supplemental Agreement, and an Indemnification Side Letter.

6. As a result of this amendment, Malden contends that it is entitled to either a refund, or a credit against its withdrawal liability owed to the Fund in the amount of approximately $1,100,000. This amount represents the sum of Malden's contributions made to the Fund from January 1, 1986 to November 30, 1986.

7. This stay was lifted on January 3, 1991, upon the issuance of the arbitrator's final award (Arb. Case No. 11–620–0007–88).

8. In its motion to confirm the arbitrator's award, the Fund challenges the arbitrator's decision that Malden initiated arbitration in a timely manner. This issue raised by the Fund is moot, however, in light of this opinion and 29 U.S.C.A. § 1401(b)(2) which requires any challenges to the arbitrator's award to be raised within 30 days of the issuance of the award.

two-day hearing, the arbitrator issued a final order stating as follows:

> The Fund was correct when it determined that [Malden] withdrew from the Fund during May, 1987. Therefore, the Fund's calculation of withdrawal liability in the amount of $5,225,563 shall be sustained.

The scope of the arbitrator's decision was limited to the issue of withdrawal liability and did not address the issues of delinquent contributions or overpayments in current contribution obligations raised by the parties in their pending cross-motions for summary judgment.

On January 29, 1991, pursuant to 29 U.S.C.A. § 1401(b)(2), Malden filed a separate civil action to modify the arbitrator's final award (C.A. No. 91–10290–C). On January 30, 1991, the Fund filed three motions in the original lawsuit (C.A. No. 88–0681–C): (1) a motion to confirm the arbitrator's final award; (2) a motion for summary judgment with respect to its pension contribution claims; and (3) a motion to amend and supplement counterclaims. In response, on March 29, 1991, Malden filed a motion for summary judgment seeking modification of the arbitrator's final award.

This Court will now address the following five issues raised by the parties: (a) the date of Malden's withdrawal from the Fund for purposes of assessing withdrawal liability; (b) Malden's liability for the allegedly delinquent plan contributions for the five and one-half month hiatus period from December 1, 1986 to May 15, 1987; (c) whether Malden is entitled to a credit or refund of its contributions made to the plan during the eleven-month period from January 1, 1986 until the expiration of the 1983–86 CBA; (d) whether Malden is entitled to a continuance under Fed.R.Civ.P. 56(f); and (e) whether the Fund is statutorily entitled to recover interest, liquidated damages, attorneys' fees and costs, insofar as they relate to the Fund's claims seeking recovery of delinquent contributions provided under ERISA 502(g), 29 U.S.C.A. § 1132(g) (1980).

## II.

The plaintiff has moved for summary judgment seeking modification of the arbitrator's final award, pursuant to Fed.R. Civ.P. 56(c). The defendants have also moved to confirm the arbitrator's award and for summary judgment with respect to their pension contribution counterclaims. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The moving party may satisfy this burden by showing that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553. Only after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact does the party opposing the motion bear the burden of responding. *Id.* at 321, 106 S.Ct. at 2551; *Adickes*, 398 U.S. at 159–60, 90 S.Ct. at 1609–10. The opposing party may not rest upon the mere allegations or denials in its pleading, but must respond with affidavits or otherwise to show the existence of a genuine issue for trial. Fed.R.Civ.P. 56(e); *Adickes*, 398 U.S. at 159–60, 90 S.Ct. at 1609–10. A dispute about a material fact is a "genuine issue" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). In light of this stan-

dard, this Court shall examine the cross motions for summary judgment.

## A. *Malden's Withdrawal Liability*

The first issue this Court must address is whether the arbitrator was correct in its determination that Malden withdrew from the ILGWU Retirement Fund in May 1987, for purposes of calculating Malden's withdrawal liability under the MPPAA.[9] Malden contends that the arbitrator erred, as a matter of law, in determining that it withdrew from the Fund in 1987, and not in January or December, 1986. The Fund argues, on the other hand, that the arbitrator's decision that Malden permanently withdraw from the Fund in May 1987, should be confirmed.

■■■ It is well-established that an arbitrator's conclusions of law in a MPPAA withdrawal liability case are subject to a *de novo* review in federal court. *Parmac, Inc. v. I.A.M. Nat'l Pension Fund Benefit Plan A*, 872 F.2d 1069, 1071 (D.C.Cir.1989); *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 872 F.2d 208, 210–14 (7th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989); *Union Asphalts and Roadoils, Inc. v. Mo–Kan Teamsters Pension Fund*, 857 F.2d 1230, 1233–34 (8th Cir.1988), *cert. denied,* 490 U.S. 1022, 109 S.Ct. 1748, 104 L.Ed.2d 185 (1989). With respect to factual findings, there is a presumption, "rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." 29 U.S.C.A. § 1401(c) (1980); *Allied Products*, 872 F.2d at 210–11. In light of this standard and the facts presented, this Court concludes

that Malden withdrew from the Fund on May 15, 1987, rather than in 1986. Thus, the Fund's assessment of withdrawal liability and the arbitrator's final award should be sustained.

Under the MPPAA's statutory scheme, an employer becomes liable for withdrawal liability upon a complete or partial withdrawal from a multiemployer plan. *See* 29 U.S.C.A. § 1381(a) (1980); *Parmac*, 872 F.2d at 1071–72; *Cuyamaca Meats, Inc. v. San Diego & Imperial Counties Butchers' & Food Employers' Pension Trust Fund*, 827 F.2d 491, 495–96 (9th Cir.1987), *cert. denied*, 485 U.S. 1008, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988). Withdrawal liability represents the employer's proportionate share of the plan's unfunded vested liability and is assessed to ensure that multiemployer plans are not rendered insolvent by withdrawing employers. *See Cuyamaca,* 827 F.2d at 496; *Debreceni v. Outlet Co.*, 784 F.2d 13, 15–16 (1st Cir.1986). Section 1383(a)(1) defines "complete withdrawal" from a plan as occurring when an employer "permanently ceases to have an obligation to contribute under the plan." [10] An "obligation to contribute" is defined as an obligation arising either "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law [NLRA]...." 29 U.S.C.A. § 1392(a) (1980); *Parmac*, 872 F.2d at 1072. In the present case, the parties agree that any such obligation to contribute arose out of the written agreements between Malden and the Union, rather than any duty under the NLRA. Thus, Malden's withdrawal lia-

---

**9.** Upon withdrawal from a multiemployer pension plan, an employer must pay its *pro rata* share of the fund's unfunded vested benefits. *See* 29 U.S.C.A. § 1381(b) (1980); *Parmac, Inc. v. I.A.M. Nat'l Pension Fund Benefit Plan A,* 872 F.2d 1069, 1070 n. 2 (D.C.Cir.1989). These unfunded vested benefits, which decrease annually, are calculated for the plan year preceding the year of the employers withdrawal, 29 U.S.C.A. § 1391(b)(2)(A)(ii) (1980). In this case the Fund's plan year is calculated on the basis of the calendar year. Withdrawal liability for a withdrawal made at any time during 1987 must be calculated as of December 31, 1986, the end of the 1986 fund year which totals $5,217,126. Whereas, if the withdrawal was made during

1986, Malden's withdrawal liability would be calculated as of December 31, 1985 which totals $5,128,961.

It is also this Court's understanding that Malden is not contesting the actuarial assumptions or any other aspect of the Fund's calculation of the withdrawal liability calculation because this issue was not raised in arbitration.

**10.** Under 29 U.S.C.A. § 1383(a)(2) (1980), a complete withdrawal also occurs when an employer permanently ceases all covered operations under the plan, but this situation is not present in this case.

bility must be determined by examining the written agreements between Malden and the Union.

As previously noted, the factual underpinnings of this case are not in dispute. What is in dispute is the legal effect, under ERISA and the MPPAA, of the Extension Agreement between Malden and the Union, effective December 1, 1986. The arbitrator held that Malden completely withdrew from the Fund in May 1987, when the new collective bargaining agreement and the related settlement agreements were executed. In determining the date of withdrawal, the arbitrator applied a "snapshot" approach which focused on the "inchoate moment" between plan years to determine whether a withdrawal has occurred before the end of a given year. (Arbitrator's Opinion pp. 39–40); *see also Parmac*, 872 F.2d at 1072. Under this approach, the arbitrator reasoned that if "we were to judge the instant case by a snapshot taken at midnight, as December 31, 1986, turned into January 1, 1987, we would necessarily find ... that [Malden's] obligation to contribute" survived the new year under the terms of the Extension Agreement.

In support of the motion to modify the arbitrator's award, Malden criticizes this snapshot approach and contends that its obligation to contribute to the Fund was contingent because, pursuant to the express terms of the Extension Agreement, this obligation could be retroactively extinguished by subsequent agreement between Malden and the Union. In other words, Malden argues that although the interim agreement extended the parties obligations under the 1983–86 CBA day-to-day, they expressly reserved the right to make their eventual successor agreement retroactive. In May 1987, when Malden and the Union executed their new CBA, this is exactly what happened, as they made it retroactively effective to December 1, 1986. Under the terms of the new CBA, Malden had no obligation to contribute to the Fund. Thus, Malden argues that its withdrawal from the Fund occurred no later than December 1, 1986 for purposes of assessing withdrawal liability under the MPPAA.

■ It is well-settled that the parties to a CBA may freely select a withdrawal date which is negotiated before the fact or prospectively. *See, e.g., Dwyer v. Climatrol Indus., Inc.*, 544 F.2d 307, 310 (7th Cir. 1976), *cert. denied*, 430 U.S. 932, 97 S.Ct. 1553, 51 L.Ed.2d 776 (1977) (parties could modify the employer's *prospective* obligation to contribute to the pension plan). The issue in this case, however, is whether the parties may retroactively amend the CBA to extinguish an employer's obligation to make pension fund contributions by expressly reserving a right to modify retroactively the terms of the CBA by agreement. The resolution of this issue is difficult because it requires a choice between the competing policies of protecting the integrity of multiemployer pension funds and private ordering, which is established between labor and management as embodied by the terms of the CBA.

As noted above, in general, the parties to a CBA may freely determine the extent of the employer's obligation to contribute to a fund, including the exact date of withdrawal. *See* 29 U.S.C.A. § 1392(a) (1980); *Parmac*, 872 F.2d at 1072 (the law is clear that employer's withdrawal liability is determined by looking at the CBA); *Fort Worth Star Telegram*, 5 E.B.C. 1193, 1197–98 (1984) ("Nothing in the MPPAA gives the plan the right to select the withdrawal date.... The matter is simply left to the business judgment of the employer and its ability to obtain agreement from the union with which it negotiates.").

■ When a term of a contract, including a CBA, is contrary to or violates an explicit public policy which is "well defined and dominant," however, the term is unenforceable. *See, e.g., W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983) (citing *Hurd v. Hodge*, 334 U.S. 24, 35, 68 S.Ct. 847, 853, 92 L.Ed. 1187 (1948)); *Sheet Metal Workers Union No. 20 v. Baylor Heating & Air Conditioning, Inc.*, 877 F.2d 547, 551 (7th Cir.1989). Whether a term of a contract violates public policy is a matter of federal law for the court to de-

termine.[11]  *See United Paperworkers' Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987); *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183. Federal labor and pension law represents such a policy. *See Laborers Health & Welfare Trust Fund for N. California v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 545–48, 108 S.Ct. 830, 834, 98 L.Ed.2d 936 (1988); *Perma–Line Corp. v. Sign Pictorial & Display Union, Local 230*, 639 F.2d 890, 894–95 (2d Cir.1981).

Thus, the next issue this Court must address is whether the provisions of the Extension Agreement, which allow the parties to modify retroactively or rescind Malden's obligation to contribute to the Fund, violate a well-established public policy. To aid the Court in answering this question, the Restatement (Second) of Contracts § 178 (1981) provides a list of relevant considerations. *See* E.A. Farnsworth, *Contracts* § 5.1 (2d ed. 1990). Section 178, entitled "When a Term is Unenforceable on Ground of Public Policy" provides:

> A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against enforcement of such terms.[12]

Restatement (Second) of Contracts § 178.

■ Congress enacted the MPPAA for two primary reasons. First, it was "concerned about the burden placed upon the remaining contributors to a multiemployer fund when one or more of them withdraw. In response to this concern Congress enacted an elaborate provision imposing 'withdrawal liability' on such withdrawing employers." *Advanced Lightweight*, 484 U.S. at 545–46, 108 S.Ct. at 834; *Outlet Co.*, 784 F.2d at 15–16. Second, Congress was also concerned about employers who had failed to make their "promised contributions on a regular and timely basis." *Advanced Concrete*, 484 U.S. at 546 & n. 12, 108 S.Ct. at 834 & n. 12. This concern stems from the fact that pension and welfare plans are insurance vehicles. *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 314 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 511, 112 L.Ed.2d 524 (1990); *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1154 (7th Cir.1989). Funds occupy the position of a third-party beneficiary of the collective bargaining agreement between the employer and union. *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 468–69, 80 S.Ct. 489, 494–95, 4 L.Ed.2d 442 (1960); *Benson*, 907 F.2d at 313; *Robbins v. Lynch*, 836 F.2d 330, 333 (7th Cir.1988). The fund receives contributions and makes payments based upon the terms negotiated by others, namely, the union and the employer. Funds rely on receiving full contributions on behalf of all employees covered. If an employer and union were permitted to extinguish this duty to contribute retroactively, it would seriously disrupt the actu-

---

**11.** Massachusetts law of illegal contracts is also instructive. As a general rule, a court will not enforce a provision in a contract which is subversive of an established public policy. *See Cadillac Auto. Co. v. Engeian*, 339 Mass. 26, 29–30, 157 N.E.2d 657 (1959); *Gleason v. Mann*, 312 Mass. 420, 422, 45 N.E.2d 280 (1942).

**12.** Section 178 continues:
(2) In weighing the interest in the enforcement of a term, account is taken of
  (a) the parties' justified expectations;
  (b) any forfeiture that would result if enforcement were denied;  and
  (c) any special public interest in the enforcement of a particular term.
(3) In weighing a public policy against enforcement of a term, account is taken of
  (a) the strength of that policy as manifested by legislation or judicial decisions;
  (b) the likelihood that a refusal to enforce the term will further that policy;
  (c) the seriousness of any misconduct involved and the extent to which it was deliberate; and
  (d) the directness of the connection between that misconduct and the term.
Restatement (Second) of Contracts § 178 (1981).
  Section 179 of the Restatement (Second) of Contracts further provides:
  A public policy against the enforcement of promises or other terms may be derived by the court from
  (a) legislation relevant to such a policy, or
  (b) the need to protect some aspect of the public welfare
  . . . .

arial soundness of the plan, which would result in the fund paying out benefits without corresponding contributions. Put another way, benefit plans must be able to rely on the contribution promises because plans must pay out benefits whether or not employers live up to their obligations.

The public policy embodied in the MPPAA is a vital one. Congress could not have been clearer in its intent or in the seriousness it attached to it when it stated:

> The public policy of this legislation to foster the preservation of the private multiemployer plan system necessitates that provision be made to discourage delinquencies and simplify delinquency collection.... A plan sponsor that prevails in any action to collect delinquent contributions will be entitled to recover the delinquent contributions, court costs, attorney's fees, interest on the contributions owed and liquidated damages. The intent of this section [515] is to promote the prompt payment of contributions and assist plans in recovering the costs incurred in connection with delinquencies....
>
> Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises.

*Advanced Lightweight,* 484 U.S. at 548 n. 15, 108 S.Ct. at 548 n. 15 (citing Senator Williams, Chairman of the Senate Committee on Labor and Human Resources, 126 Cong.Rec. 23039 (1980)).

■ Due to these reasons, Congress intended to place multiemployer plans in a position superior to the traditional third-party beneficiary who is subject to "any contract defense which the promisor could assert against the promisee if the promisee were suing on the contract." *Benedict Coal,* 361 U.S. at 469, 80 S.Ct. at 495; *Benson,* 907 F.2d at 314; *Southwest Adm'rs, Inc. v. Rozay's Transfer,* 791 F.2d 769, 773 (9th Cir.1986), *cert. denied,* 479

U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 999 (1987). The MPPAA places the fund in a position analogous to that of a holder in due course, or a receiver of a failed bank, with the power to enforce the contract "without regard to the understandings or defenses applicable to the original parties." *See Gerber Truck,* 870 F.2d at 1149; *Benson,* 907 F.2d at 314–15 (Section 515 of the MPPAA limits the defenses available to an employer when sued by a benefit plan. The employer's defenses that are recognized by the courts include pension contributions which are themselves illegal or that the CBA is void.); *Robbins,* 836 F.2d at 333. Thus, once an employer signs an agreement that requires him to contribute to a pension plan, he may not avoid this obligation by raising defenses that challenge the enforceability of the contract as a whole.

■ Ordinary contractual analysis also suggests that an employer should not be permitted to modify retroactively or extinguish its obligation to contribute to a multiemployer pension fund.[13] Under general principles of third-party beneficiary law, the parties to the contract may rescind or modify the contract as they see fit without the approval of the third-party, at any time before the beneficiary's rights vest. *See* E.A. Farnsworth, *Contracts* § 10.8 (2d ed. 1990). After the contract is accepted, adopted or acted upon by a third-party beneficiary, however, its rights become vested. *Id.* The Restatement (Second) of Contracts § 311 provides that, in the absence of a term in the third-party beneficiary contract prohibiting modification of a duty to an intended beneficiary, the promisor and promisee retain the power to discharge or modify the agreement by subsequent agreement. *See Karo v. San Diego Symphony Orchestra Ass'n,* 762 F.2d 819, 822 (9th Cir.1985); *Price v. Pierce,* 823 F.2d 1114, 1122 (7th Cir.1987), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 422 (1988). This power to modify or rescind terminates, however, when the "beneficiary

---

13. In addressing a somewhat analogous situation, the First Circuit Court of Appeals, in *Debreceni v. The Outlet Co.,* held that an employer and union could not enter into an asset sale

agreement, the terms of which were made "retroactively binding to the detriment of third persons [the Fund] not party to the contract." 784 F.2d 13, 19 (1st Cir.1986).

materially changes position in justifiable reliance on the promise before receiving notice of the modification." *See Karo*, 762 F.2d at 822; Restatement (Second) of Contracts § 311(3) (1981). This is because a recession or modification after a change in position by a third-party beneficiary deprives that third-party of its expectations under the contract.

A pension benefit fund detrimentally relies on the terms of the CBA immediately upon its effective date. This reliance is due to the fact that the terms of the CBA create the fund's obligation to provide benefits to the plan participants. Immediately upon the effective date of the CBA, benefits accrue to both the current employees who are accruing pension credits and those retired participants who are actually receiving pension payments. In this context, although the parties are free to reserve the right to terminate their obligation to contribute *prospectively*, to do so *retroactively* during a period when the fund is relying on the receipt of contributions and providing benefits to covered participants would not permit accurate actuarial computations and proper decisions about which claims to pay.[14] This would leave the fund with a duty to pay benefits without corresponding contributions.

■ Prospective modifications of the terms of the CBA, however, when the right to modify or amend is specifically reserved, are valid and enforceable because it is not to the detriment of the vested interests of the third-party beneficiary pension fund, because the fund is not placed in a situation where it is obligated to provide benefits currently which may be retroactively extinguished. *See Dwyer v. Climatrol Indus. Inc.*, 544 F.2d 307, 310 (7th Cir.1976).

The implications of allowing parties the right to contractually avoid their obligation to contribute to a fund, which is not a party to the agreement, are far reaching. If employers and unions were permitted to reserve the right to extinguish retroactively their pension obligations owed to a multiemployer fund, they would include this "escape clause" in their CBA's, and when a more favorable investment opportunity arose, the parties would invoke this provision and retroactively withdraw from their current plans. The employer would then demand that the fund refund its previously paid contributions. This would permit the parties to take a free ride at the expense of the fund, because the withdrawing employer has no interest in the welfare of the other members of the multiemployer plan. An employer and union, through the use of this reserved right to modify, should not have the freedom to determine at what moment in time, if at all, to cancel retroactively their coverage in order to invest in an alternative plan, such as a single-employer retirement plan, at the expense of the multiemployer fund. Although other employee benefits may be retroactively extinguished by agreement, when the subsequent modification is at the expense of a third-party beneficiary's interest, retroactive modification should not be permitted. The employer and the union should not be able to have their cake and eat it too.

As discussed above, Congress has made a clear and unambiguous statement that the MPPAA was designed to protect multiemployer funds from exactly the situation presented in this case. This Court finds that the terms contained in the Extension Agreement and other related agreements which provide for the retroactive modification of Malden's duties and obligations under the 1983–86 CBA, as they apply to the Fund, operates in contravention of these explicit policies. The enforcement of this contractual term is, therefore, contrary to public policy. Thus, the only remaining issue to be resolved is whether the term should be considered void.

---

**14.** Pension funds rely on the terms of the CBA to determine the income they can expect to receive, which governs their determination of levels of benefits. *See Gerber Truck*, 870 F.2d at 1151; *Lynch*, 836 F.2d at 333. Multiemployer plans are defined-contribution in, defined-benefit out. Once the fund promises a specified level of benefits to employees, it is then obligated to pay such an amount even if they do not receive the corresponding contributions from employers. *Id.* Thus, if some employers fail to pay, others must make up the difference in higher contributions, or the employees will receive less than was promised. *Id.*

To do so, the Court must weigh the interest in the enforcement of this term, against the public policy against enforcement. Malden advances several arguments regarding public policy considerations in favor of enforcement of the contract provisions, which it contends outweigh the considerations outlined above. Although Malden's arguments have some merit, they do not outweigh the public policy embodied in the MPPAA.

■ First, Malden argues that because an employer and a union may retroactively extinguish a statutory obligation to contribute to a pension, the same policy should allow for the retroactive modification of the employer's contractual obligation to contribute to the fund. In limited circumstances, an employer and union may agree to the retroactive contractual modification of a *statutory,* but not *contractual,* obligation to contribute to a pension fund. *See Advanced Lightweight,* 484 U.S. at 553, 108 S.Ct. at 838; *Rozay's Transfer v. Local Freight Drivers, Local 208,* 850 F.2d 1321, 1333 (9th Cir.1988), *cert. denied,* 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989). This judicially developed exception, the scope of which is uncertain, only applies to obligations which arise during a post-contract period upon the expiration of a CBA when the employer may still have a continuing obligation to contribute under 29 U.S.C.A. § 1392(a)(2) (1980). Section 1392(a)(2) provides that an employer may have an obligation to a pension fund "as a result of a duty under applicable labor-management relations law." *See Rozay's Transfer,* 850 F.2d at 1331–33; *Cuyamaca,* 827 F.2d at 497. The rationale for this exception is that upon the expiration of an express contractual obligation to contribute to a benefit plan, the policies of the MPPAA no longer vindicate the interests that motivated its passage. *See Advanced Lightweight,* 484 U.S. at 551–53, 108 S.Ct. at 837–38. Thus, courts have reasoned that the policies of the MPPAA should give way to the labor policy under the NLRA.

The Supreme Court in *Advanced Lightweight* stated a number of reasons to support this exception. First, the issues that must be resolved in a dispute involving an employer's refusal to make post-contractual contributions are more complex than those presented in an action that arises under a contractual obligation of the parties. In addition, the remedies provided under the MPPAA are problematic in cases where there is a "good-faith dispute over both the existence and the extent of the employer's liability," such as the question whether impasse has been reached. *Id.* Second, the issue whether an "employer's unilateral decision to discontinue a pension plan constitutes a violation of the statutory duty to bargain in good-faith is the kind of question that is routinely resolved by the administrative agency with expertise in labor law." *Id.* at 553, 108 S.Ct. at 838. Finally, the employer and the union "may enter into a settlement that either reduces, or even might waive, the employer's post-contract obligations to contribute to the pension fund." *Id.* at 553, 108 S.Ct. at 838.

■ Malden contends that this exception should be extended to cover the present situation where the employer has a contractual obligation to contribute to the fund. This limited exception, however, does not apply to the facts of this case because the employer's contractual obligation never expired. The Extension Agreement bridged the gap between the expiration of the 1988–86 CBA which expired on November 31, 1986, and the new CBA dated May 15, 1987. Moreover, the reasoning as expressed by the Supreme Court in *Advanced Concrete* does not apply to the present situation because the relationship between the parties was governed by a contractual obligation, as opposed to statutory obligations under the NLRA. During the post-contract period, the fund's reliance on receiving contributions is not as great because there is no written obligation in force that the third-party beneficiary fund may enforce against the employer. Thus, this Court refuses to extend this limited exception to cover the present situation.

Along similar lines, Malden contends that because an employer who suspends contributions during a labor dispute that ends in

the cessation of contributions is deemed to have withdrawn from the plan at the time it originally suspended the contributions, that the same rationale should allow the parties in this case to modify retroactively the employer's pension obligation under the Extension Agreement. Under Section 4218 of the MPPAA, 29 U.S.C.A. § 1398 (1980), some courts have developed a limited exception to protect employers from premature assessments of withdrawal liability when contributions are suspended during a labor dispute. This "labor dispute" exception, which is not applicable to this case because the parties entered into the Extension Agreement upon the expiration of the 1983–86 CBA, provides that when the labor dispute ends, if there is a cessation of the obligation to contribute to the plan, the fund may assess withdrawal liability and the assessment "relates back" to the date of the initial suspension. *See T.I.M.E.-DC, Inc. v. New York State Teamsters Conference Pension & Retirement Fund*, 580 F.Supp. 621, 629 (N.D.N.Y.), *aff'd*, 735 F.2d 60 (2d Cir.1984); *I.A.M. Nat'l Pension Fund, Benefit Plan C v. Schulze Tool and Die Co.*, 564 F.Supp. 1285, 1295 (N.D.Ca. 1983). This section was intended to prevent the risk of withdrawal liability from influencing labor-management negotiations when the employer has no intention of withdrawing from the plan. *See Schulze Tool*, 564 F.Supp. at 1295. To hold an employer responsible for withdrawal liability during a protracted labor dispute may seriously impede the parties' ability to reach a new agreement and restore pre-dispute operations. *See T.I.M.E.-DC*, 580 F.Supp. at 629. Moreover, given the uncertainties over the nature and extent of the employer's statutory obligations to the fund during the period after the expiration of the CBA, this exception represents a reasonable balance between the policies under the MPPAA and the NLRA. (Arbitrator's Opinion, p. 47).

These policies, however, do not apply with equal force to the present case. Here, there was not a labor dispute nor was there a lapse in the parties' contractual obligation to contribute to the Fund because the parties chose to enter into an Extension Agreement which continued the parties' obligation under the expired 1983–86 CBA. Thus, this Court declines to extend the application of the "labor dispute" exception to the facts of this case.

Finally, Malden argues that not to enforce its agreements with the Union would frustrate national labor policy promoting private ordering and recognizing unions as their members' sole bargaining representatives. Malden contends that the effect of the arbitrator's ruling is to encourage an employer, who desires withdrawal from a pension plan, to force a strike or impasse immediately upon the expiration of an existing agreement. This ruling, according to Malden, frustrates the union's ability to negotiate in a manner designed to secure maximum advantage for its members with a minimum of industrial strife.

This Court finds this argument without merit. In this case, Malden could have negotiated for a term in the interim agreement which allowed for the parties to *prospectively* extinguish its right to contribute to the Fund if it desired to withdraw from the plan. Thus, by reserving a right to modify prospectively its obligation to contribute, Malden would not adversely effect the reliance interests of the third-party beneficiary Fund and it would still have the ability to later withdraw from the Fund without forcing a strike or entering into a labor dispute.

Upon balancing the competing pension, contract, and labor policies, this Court holds that the provisions of the Extension Agreement and other related agreements between Malden and the Union, which provide that modifications may be made retroactively, are void and unenforceable as contrary to public policy, insofar as they apply to Malden's obligations to the Fund. In this case, the illegal provision may easily be severed without destroying an otherwise enforceable agreement. *See National Labor Relations Bd. v. Rockaway News Supply Co.*, 345 U.S. 71, 78–79, 73 S.Ct. 519, 523–524, 97 L.Ed. 832 (1953) (legal provisions of a CBA may be severed from illegal provisions and enforced to avoid obliterating the entire CBA); *Sheet Metal Workers'*

*Int'l Ass'n, Local 206 v. West Coast Sheet Metal Co.,* 660 F.Supp. 1500, 1507 (S.D.Ca. 1987) (same). Therefore, this Court will sever this void provision, as it applies to Malden's obligations to the Fund, and enforce the remaining terms of the agreement as written.

The next issue this Court must address is the effect the severance of this term has on Malden's date of withdrawal from the Fund for the purpose of calculating Malden's withdrawal liability under the MPPAA. After this term is severed from the Extension Agreement, the agreement provides that "the Company and the Union agree to a day-to-day extension of their existing collective bargaining agreement." This agreement remained operative from December 1, 1986 until May 15, 1987, when Malden and the Union executed a new three-year CBA. The terms of the new CBA, effective May 15, 1987, did not obligate Malden to contribute to the ILGWU Retirement Fund, but rather a new single-employer fund. Thus, Malden was contractually obligated to contribute to the Fund until May 15, 1987, under the terms of the 1983–86 CBA and the Extension Agreement which was made effective December 1, 1986.

According to the definition contained in 29 U.S.C.A. § 1392(a)(1), Malden had an "obligation to contribute" to the Fund until May 15, 1987. Under the definition of "complete withdrawal," Malden's obligation to contribute could not have "permanently ceased" until after December 31, 1986, more specifically, until May 15, 1987. *See* 29 U.S.C.A. § 1383(a)(1) (1980). Accordingly, Malden did not completely withdraw from the Fund until May 15, 1987, for purposes of determining withdrawal liability under the MPPAA. Therefore, the Fund's motion to confirm the Arbitrator's award should be granted, albeit on a different rationale, and Malden's motion to modify the arbitrator's award should be denied.

B. *The Delinquent Contributions Claim*

The second issue this Court must address is whether Malden is liable to the Fund for delinquent contributions for the five and one-half month hiatus period. This period spans from December 1, 1986, the expiration of the 1983–86 CBA, until May 15, 1987, the date of execution of the new CBA. This period was covered by the Extension Agreement, executed by Malden and the Union on November 26, 1986, with an effective date of December 1, 1986. The Fund contends that, as a matter of law, under the terms of the Extension Agreement, Malden owes $651,272.54 to the Fund for contributions not paid during this five and one-half month period.

■ Section 515 of the MPPAA, 29 U.S. C.A. § 1145 provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such law or such agreement.

It is well-established that this section "creates a federal right of action independent of the contract on which the duty to contribute is based." *See Central States, Southeast & Southwest Areas Pension Fund v. Independent Fruit & Produce Co.,* 919 F.2d 1343, 1347 (8th Cir.1990). It is equally well-settled that Congress intended that this section would simplify collection actions by permitting funds to recover delinquent contributions officiously and without regard to issues which might arise under labor law. *See Berry v. Garza,* 919 F.2d 87, 89–90 (8th Cir.1990); *Benson,* 907 F.2d at 314.

■ In the present case, in light of this Court's previous holding on the issues regarding the date of Malden's withdrawal, the undisputed facts establish that Malden had an obligation to contribute to the Fund under 29 U.S.C.A. § 1145 during the entire five and one-half month period. Malden and the Union voluntarily executed the interim agreement which specifically extended the terms of the 1983–86 CBA, including Malden's obligation to contribute to the Fund. Although the Extension Agreement was subject to termination by either party

on 24 hours' notice, this clause was never invoked, and thus the agreement remained operative from December 1, 1986, until May 15, 1987. It was not until May 15, 1987, when Malden and the Union executed a new three-year CBA which did not require Malden to contribute to the ILGWU Retirement Fund, did Malden's obligation to contribute cease. It is also undisputed that Malden failed to make any contributions to the Fund after November 30, 1986. Therefore, the Fund's motion for summary judgment with respect to the delinquent contributions claim should be granted.

### C. *The Overpayment Claim*

The third issue this Court must address is whether Malden is entitled to a refund or credit against its withdrawal liability for contributions paid to the Fund from January 1, 1986 through November 30, 1986. To support this overpayment claim, Malden argues that it has a right to restitution under federal common-law, based on equitable principles of unjust enrichment, of the nearly $1,100,000 in contribution payments it made to the Fund in 1986. The Fund contends, on the other hand, that Malden is not entitled to a refund under principles of equity.

Malden's claim is based upon the "Amendment to the 1983–86 Collective Bargaining Agreement," which Malden and the Union executed in May, 1987. The terms of this Amendment purport to extinguish retroactively Malden's obligation to the Fund under the terms of the expired 1983–86 CBA. The amendment expressly provides that Malden's "obligation to contribute to the ILGWU National Retirement Fund shall cease for all periods from and after January 1, 1986."

■ It is well-settled that the MPPAA does not confer upon employers a statutory or an implied right of action to recover mistakenly paid contributions to pension funds. *Kwatcher v. Massachusetts Serv. Employees Pension Fund*, 879 F.2d 957, 964 (1st Cir.1989). Section 403(c)(2)(A)(ii) of the MPPAA, 29 U.S.C.A. § 1103(c)(2)(A)(ii) (1980), which expressly permits funds to return mistakenly paid

contributions, empowers only "participants," beneficiaries," "fiduciaries," and in limited instances the Secretary, to seek redress in federal court. *Kwatcher*, 879 F.2d at 964–95. The First Circuit, however, does recognize a federal common-law right of restitution in favor of employers in ERISA and MPPAA cases, where principles of equity make such an award appropriate. *Id.* at 966 (common law remedy only provides for the "return of amounts actually paid to, and unjustly retained by pension funds"); *Plucinski v. I.A.M. Nat'l Pension Plan*, 875 F.2d 1052, 1057–58 (3d Cir.1989) (same); *Whitworth Bros. Storage Co. v. Central States, Southeast & Southwest Areas Pension Fund*, 794 F.2d 221, 235–36 (6th Cir.), *cert. denied*, 479 U.S. 1007, 107 S.Ct. 645, 93 L.Ed.2d 701 (1986) (same). In determining whether the employer is entitled to restitution, the Court should consider all factors relevant to the fairness of reimbursement, including the impact of restitution on the plan's financial stability, then weigh these factors against general equitable considerations and the policies and purposes of ERISA and the MPPAA. *Kwatcher*, 879 F.2d at 976.

■ In this case, such an equitable award of restitution would be highly inappropriate. Here, the equities strongly favor the Fund which furnished retirement pension benefits to Malden's employees during the entire period from January through November 1986 when Malden was making contribution payments to the Fund. First, Malden's claim is not based on an overpayment due to a mistake of law or fact, but is based on a subsequent amendment of the terms of an expired CBA which extinguished retroactively its obligation to contribute to the Fund in 1986. Second, given that the Fund was entitled to contributions under the terms of the CBA when they were made, it seems inequitable to now allow Malden, after the fact, to recover the sums already paid against this obligation. *See Robbins*, 836 F.2d at 334; *Dwyer*, 544 F.2d at 310. Finally, a fundamental policy of ERISA and the MPPAA, as expressed in 29 U.S.C.A. § 1103(c)(1) (1980), is the preservation of the funds for

providing benefits to the plan participants and beneficiaries. After balancing the equities present in this case, in light of the policies of ERISA and the MPPAA, this Court finds that Malden is not entitled to restitution for its contributions paid into the Fund during 1986. Thus, the Funds's motion for summary judgment on its overpayment claim should be granted.

### D. *Malden's Claims for the Necessity For Discovery*

Malden complains that the Fund's motion for summary judgment with respect to the pension contribution claims is premature and should not be granted until they have an opportunity to conduct further discovery. Malden cites Fed.R.Civ.P. 56(f) in support of its request that this Court deny the Fund's motion or withhold its decision. In support of this request, Malden states, in its opposition to the Fund's motion for summary judgment, that it "is entitled to develop further factual information especially from the Union representatives, who are not under Malden's control except through formal discovery procedures." Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Rule 56(f) requires that the party opposing summary judgment submit affidavits in support of its motion specifically stating reasons why it needs additional time to conduct discovery in order to prepare its opposition. *See, e.g., Hebert v. Wicklund,* 744 F.2d 218, 221–22 (1st Cir.1984) (affidavits are required in support of a Rule 56(f) motion); *Over the Rd. Drivers, Inc. v. Transport Ins. Co.,* 637 F.2d 816, 820–21 (1st Cir.1980) (hope that further discovery may uncover further evidence insufficient under Rule 56(f)).

In this case, Malden did not comply with Rule 56(f). Malden never filed an affidavit specifically presenting reasons why it could not adequately prepare its opposition without first conducting further discovery. Malden's opposition to the Fund's motion for summary judgment is not an affidavit. *See Hebert,* 744 F.2d at 221. In its opposition, Malden argues that it needs additional time to "develop factual information, especially from Union representatives." Malden fails, however, to provide any specifics with respect to what information it was seeking from the Union and why this so-called "information" was so crucial to the preparation of its defense. Moreover, this Court granted Malden's motion to enlarge time to respond until March 29, 1991, which provided Malden with over three months to conduct discovery before it was required to respond to the Fund's motion for summary judgment. Therefore, because Malden has not complied with the requirements of Rule 56(f), nor presented any specific reasons in support of its request for further discovery, its motion for a continuance should be denied.

### E. *Attorneys' Fees and Costs*

Finally, because the Fund is entitled to judgment in its favor for delinquent contributions and withdrawal liability, section 1132(g)(2) requires Malden to pay reasonable attorneys' fees, costs and liquidated damages. Section 1132(g)(2) provides:

> In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—
> (A) the unpaid contributions,
> (B) interest on the unpaid contributions,
> (C) an amount equal to the greater of—
> (i) interest on the unpaid contributions, or
> (ii) liquidated damages provided for under the plan in an amount not in excess of 20% of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.[15]

29 U.S.C.A. § 1132(g)(2) (1980). It is well-established that the remedies under this section are mandatory. *See Advanced Lightweight*, 484 U.S. at 539, 108 S.Ct. at 830 (an award under section 1132(g)(2) is mandatory when the fund is the prevailing party); *Gerber Truck*, 870 F.2d at 1156 (same); *Massachusetts Laborers' Health & Welfare Fund v. Starrett Paving Corp.*, 845 F.2d 23, 23 (1st Cir.1988). Although the literal wording of section 1132(g)(2) refers to an "action" by a fiduciary, various courts have interpreted this to include a counterclaim by a pension fund for withdrawal liability or delinquent contributions under section 1145. *See Penn Elastic Co. v. United Retail & Wholesale Employees Union, Local 115 Joint Pension Fund*, 792 F.2d 45, 47 (3d Cir.1986); *Trustees of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc.*, 683 F.Supp. 986, 992–93 (E.D.Pa.), *aff'd*, 862 F.2d 1020 (3d Cir.1988); *but see Niagara of Wisconsin Paper Corp. v. Paper Indus. Union–Management Pension Fund*, 603 F.Supp. 1423, 1429–30 (D.Minn.1984), *aff'd*, 800 F.2d 742 (8th Cir.1986). In light of this precedent, this Court rejects Malden's argument that it should not have to pay fees and costs because the Fund did not initiate this action. Therefore, the Fund, as the prevailing party in this case, is entitled to reasonable attorneys' fees and other costs as provided under section 1132(g)(2), with respect to its delinquent contributions claims.

The Fund also argues that it is entitled to recover its attorneys' fees and costs incurred with respect to the withdrawal liability portion of this case. Section 1451(b) provides that the employer's failure to make withdrawal liability payments within the time prescribed "shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title)." 29 U.S.C.A. § 1451(b) (1980).

Relying on this section, some courts have held a pension fund's withdrawal liability claim should be treated in the same manner as a suit for the recovery of delinquent contributions within the meaning of section 1145. *See Robbins v. B & B Lines, Inc.*, 830 F.2d 648, 651 (7th Cir.1987); *Sheldon Hall*, 862 F.2d at 1023; *Penn Elastic*, 792 F.2d at 47; *Debreceni v. J.C. Campbell Paper Co.*, C.A. No. 84–507–WF (D.Mass. 1988) (LEXIS, GENFED Library). Due to the fact that the law is unclear under section 1451(b) with respect to whether the Fund is entitled to costs with respect to the withdrawal liability portion of its award, the Court requests that the parties submit a memorandum of law on this issue, pursuant to the Order issued on this date.

For all the reasons stated above, the defendants', ILGWU National Retirement Fund and certain of its trustees, motion for summary judgment should be granted as to Counts I and II of the defendants' Amended Counterclaims (C.A. No. 88–0681–C), and the plaintiff's, Malden Mills Industries, Inc., motion for summary judgment as to Count I of the plaintiff's Complaint (C.A. No. 91–10290–C) should be denied.

Order accordingly.

---

**15.** Under 29 U.S.C.A. § 1132(g) "interest shall be determined by using the rate provided under the plan."