# LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA ET AL. *v.* ADVANCED LIGHTWEIGHT CONCRETE CO., INC.

No. 85-2079.   Argued November 10, 1987—Decided February 23, 1988

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except KENNEDY, J., who took no part in the consideration or decision of the case.

*Michael B. Roger* argued the cause for petitioners. With him on the briefs were *Blythe Mickelson* and *Barry E. Hinkle.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Deputy Solicitor*

*General Cohen, George R. Salem, Allen H. Feldman*, and *Ellen L. Beard.*

*Mark S. Ross* argued the cause for respondent. With him on the brief were *Leonard L. Scheinholtz, Hollis T. Hurd*, and *Morton H. Orenstein.**

JUSTICE STEVENS delivered the opinion of the Court.

A company that is a party to a collective-bargaining agreement may have a contractual duty to make contributions to a pension fund during the term of the agreement and, in addition, may have a duty under the National Labor Relations Act (NLRA) to continue making such contributions after the expiration of the contract and while negotiations for a new contract are in process. In 1980, Congress amended the Employee Retirement Income Security Act (ERISA) to provide trustees of multiemployer benefit plans with an effective federal remedy to collect delinquent contributions. The question presented in this case is whether that remedy encompasses actions based on an alleged breach of the employer's statutory duty as well as those based on an alleged breach of contract. We agree with the Court of Appeals' conclusion that the remedy is limited to the collection of "promised contributions."

I

Prior to 1983, respondent was a member of the Associated General Contractors of California and a party to two multiemployer collective-bargaining agreements negotiated on its

---

*Briefs of *amici curiae* urging reversal were filed for Carpenters Southern California Administrative Corporation by *Colin M. Long;* for the National Coordinating Committee for Multiemployer Plans by *Gerald M. Feder* and *David R. Levin;* and for the Tri-State U.F.C.W. and Employers Benefit Fund by *William P. Getty.*

Briefs of *amici curiae* urging affirmance were filed for the Associated General Contractors of America, Inc., by *A. J. Harper II, T. J. Wray*, and *David M. Thomas;* and for the Chamber of Commerce of the United States by *Stephen A. Bokat* and *Robin S. Conrad.*

behalf by that association.[1]  The agreements included provisions requiring respondent to make monthly contributions to eight different employee benefit plans.[2]  The collective-bargaining agreements, which were executed in 1980, had an expiration date of June 15, 1983.

On April 1, 1983, respondent notified both unions that it had terminated the association's authority to bargain on its behalf, that it would not be bound by either master agreement (or any successor agreement) after the June 15, 1983, expiration date, and that it was prepared to negotiate with the unions independently.  Respondent continued to contribute to the eight trust funds until June 15, 1983, but has made no contributions since that date.

In December 1983, the trustees of the eight plans (petitioners)[3] brought suit in the Federal District Court for the Northern District of California against respondent to collect contributions for the period after June 15, 1983.  Petitioners allege that respondent's unilateral decision to change the terms and conditions of employment by discontinuing its contributions constituted a breach of its duty to bargain in good faith and violated § 8(a)(5) of the NLRA.  61 Stat. 141, 29

---

[1] One agreement was with the District Council of Plasterers and Cement Masons of Northern California and the other was with the Northern California District Council of Laborers.

[2] Those eight plans are: The Laborers Health and Welfare Trust Fund for Northern California; the Laborers Pension Trust Fund for Northern California; the Laborers Vacations-Holiday-Dues Trust Fund for Northern California; the Laborers Training and Retraining Trust Funds for Northern California; the Cement Masons' Health and Welfare Trust Fund for Northern California; the Cement Masons Pension Trust Fund for Northern California; the Cement Masons Vacation-Holiday-Supplemental Dues Trust Fund for Northern California; and the Cement Masons Apprenticeship and Training Trust Fund for Northern California Fund.

[3] The named parties are the plans, rather than the trustees, but the relevant statute refers to an action "by a fiduciary for or on behalf of a plan." 29 U. S. C. § 1132(g)(2).

U. S. C. § 158(a)(5). The complaints alleged that the federal court had jurisdiction under §§ 502(g)(2) and 515 of ERISA.[4]

Respondent's answer to the complaint challenged the District Court's jurisdiction and also denied that respondent had any statutory duty to make contributions to the funds because its negotiations with the unions had reached an "impasse."[5] The "impasse" issue has never been resolved

---

[4] "As a general rule, federal courts do not have jurisdiction over activity [that] is 'arguably subject to § 7 or § 8 of the [NLRA],' and they 'must defer to the exclusive competence of the National Labor Relations Board.'" *Kaiser Steel Corp.* v. *Mullins*, 455 U. S. 72, 83 (1982) (quoting *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 245 (1959)). We have also held, however, that "federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies . . . ." *Connell Construction Co.* v. *Plumbers & Steamfitters*, 421 U. S. 616, 626 (1975). The question in this case is whether Congress has provided, through ERISA §§ 502(g)(2) and 515, such an "independent federal remedy."

The complaints also alleged jurisdiction under § 301 of the Labor Management Relations Act (LMRA), 61 Stat. 156, 29 U. S. C. § 185, but petitioners now rely entirely on ERISA to support federal jurisdiction.

[5] As the Court of Appeals correctly stated:

"'Impasse' is an imprecise term of art:

"The definition of an 'impasse' is understandable enough—that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless—but its application can be difficult. Given the many factors commonly itemized by the Board and courts in impasse cases, perhaps all that can be said with confidence is that an impasse is a 'state of facts in which the parties, despite the best of faith, are simply deadlocked.' The Board and courts look to such matters as the number of meetings between the company and the union, the length of those meetings and the period of time that has transpired between the start of negotiations and their breaking off. There is no magic number of meetings, hours or weeks which will reliably determine when an impasse has occurred.

"R. Gorman, Basic Text on Labor Law: Unionization and Collective Bargaining 448 (1976) (citation omitted)." 779 F. 2d 497, 500, n. 3 (CA9 1985).

If the parties were indeed at an impasse, then the employer's statutory duty to maintain the status quo during postcontract negotiations, see n. 6, *infra*, would end. See, *e. g.*, *American Ship Building Co.* v. *NLRB*, 380

because the District Court granted a motion for summary judgment based on two other grounds: That § 515 of ERISA does not apply to an employer's obligations under § 8(a)(5) of the NLRA; and that the National Labor Relations Board (NLRB) has exclusive jurisdiction over petitioners' claims.

The Court of Appeals affirmed. 779 F. 2d 497 (CA9 1985). It necessarily assumed that petitioner could prove that respondent's postcontract refusal to contribute to the funds was an unfair labor practice.[6] It held, however, that the claims should be resolved by the NLRB rather than by a federal district court. After examining the text and the legislative history of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), the Court concluded:

---

U. S. 300, 318 (1965) (no unfair labor practice "when, after a bargaining impasse has been reached, [employer] temporarily shuts down his plant and lays off his employees for the sole purpose of bringing economic pressure to bear in support of his legitimate bargaining position"); *Taft Broadcasting Co.*, 163 N. L. R. B. 475, 478 (1967) ("[A]fter bargaining to an impasse, that is, after good-faith negotiations have exhausted the prospects of concluding an agreement, an employer does not violate the Act by making unilateral changes that are reasonably comprehended within his preimpasse proposals"), aff'd *sub nom. American Federation of Television & Radio Artists* v. *NLRB*, 129 U. S. App. D. C. 399, 395 F. 2d 622 (1968). Here, since the District Court determined on motion for summary judgment that it had no jurisdiction to entertain plaintiffs' unfair labor practice claim, the factually disputed impasse issue was never resolved.

[6] "Freezing the status quo ante after a collective agreement has expired promotes industrial peace by fostering a non-coercive atmosphere that is conducive to serious negotiations on a new contract. Thus, an employer's failure to honor the terms and conditions of an expired collective-bargaining agreement pending negotiations on a new agreement constitutes bad faith bargaining in breach of sections 8(a)(1), 8(a)(5) and 8(d) of the National Labor Relations Act. . . . *NLRB v. Katz*, 369 U. S. 736, 743 . . . (1962). Consequently, any unilateral change by the employer in the pension fund arrangements provided by an expired agreement is an unfair labor practice. *Peerless Roofing Co. v. NLRB*, 641 F. 2d 734, 735 (9th Cir. 1981); *Producer's Dairy Delivery Co. v. Western Conference of Teamsters Pension Trust Fund*, 654 F. 2d 625, 627 (9th Cir. 1981)." 779 F. 2d, at 500.

"We find no persuasive evidence in either the plain words or legislative history of ERISA or the MPPAA that Congress intended section 515 to be an exception to the general rule of NLRB preemption for that narrow category of suits seeking recovery of unpaid contributions accrued during the period between contract expiration and impasse." *Id.*, at 505.[7]

We granted certiorari, 479 U. S. 1083 (1987), and now affirm.

## II

In its 1980 amendments to ERISA, Congress responded to two concerns that are relevant to the question presented by this case. It was primarily concerned about the burden placed upon the remaining contributors to a multiemployer fund when one or more of them withdraw.[8] In response to this concern Congress enacted an elaborate provision imposing "withdrawal liability" on such withdrawing employers.[9] That liability arises when an employer ceases to have an "obligation to contribute" to the plan.[10] That term is defined for the purposes of the withdrawal liability portion of the statute in language that unambiguously includes both the employer's

---

[7] All other Courts of Appeals that have addressed this issue have reached the same result. See *New Bedford Fishermen's Welfare Fund* v. *Baltic Enterprises, Inc.*, 813 F. 2d 503 (CA1 1987); *Moldovan* v. *Great Atlantic & Pacific Tea Co.*, 790 F. 2d 894, 900–901 (CA3 1986); *U.A. 198 Health & Welfare, Education & Pension Funds* v. *Rester Refrigeration Service, Inc.*, 790 F. 2d 423 (CA5 1986).

[8] See MPPAA § 3(a)(4), 94 Stat. 1209, 29 U. S. C. § 1001a (a)(4).

[9] See MPPAA § 104, 94 Stat. 1217–1244, 29 U. S. C. §§ 1381–1405.

[10] Section 4203(a) of ERISA provides:

"For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer—

"(1) permanently ceases to have an obligation to contribute under the plan, or

"(2) permanently ceases all covered operations under the plan."  94 Stat. 1218, 29 U. S. C. § 1383(a).

Neither petitioners nor respondent suggests that respondent has withdrawn from the plans.

contractual obligations and any obligation imposed by the NLRA.[11] That definition is significant because it demonstrates that Congress was aware of the two different sources of an employer's duty to contribute to covered plans.

Congress was also concerned about the problem that had arisen because a substantial number of employers had failed to make their "promised contributions" on a regular and timely basis.[12] Sections 515 and 502(g)(2) of ERISA, the provisions at issue in this case, were enacted in response to that concern. The text of § 515 plainly describes the employer's contractual obligation to make contributions but omits any reference to a noncontractual obligation imposed by the NLRA. Section 515 provides:

> "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such

---

[11] Under the subhead "obligation to contribute; special rules," § 4212(a) of ERISA provides:

"For purposes of this part, the term 'obligation to contribute' means an obligation to contribute arising—

"(1) under one or more collective bargaining (or related) agreements, or

"(2) as a result of a duty under applicable labor-management relations law, but

"does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions." 94 Stat. 1233, 29 U. S. C. § 1392(a).

[12] "Delinquencies of employers in making required contributions are a serious problem for most multiemployer plans. Failure of employers to make *promised contributions* in a timely fashion imposes a variety of costs on plans. While contributions remain unpaid, the plan loses the benefit of investment income that could have been earned if the past due amounts had been received and invested on time. Moreover, additional administrative costs are incurred in detecting and collecting delinquencies. Attorneys fees and other legal costs arise in connection with collection efforts." Senate Committee on Labor and Human Resources, 96th Cong., 2d Sess., S. 1076, The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration 43 (Comm. Print 1980) (emphasis added).

contributions in accordance with the terms and conditions of such plan or such agreement." 94 Stat. 1295, 29 U. S. C. § 1145.

The liability created by § 515 may be enforced by the trustees of a plan by bringing an action in federal district court pursuant to § 502. The special remedy against employers who are delinquent in meeting their contractual obligations that is created by § 502(g)(2) includes a mandatory award of prejudgment interest plus liquidated damages in an amount at least equal to that interest, as well as attorney's fees and costs.[13]

The legislative history of these provisions explains that Congress added these strict remedies to give employers a strong incentive to honor their contractual obligations to contribute and to facilitate the collection of delinquent accounts.[14]

---

[13] Section 502(g)(2) provides:

"In any action under this title by a fiduciary for or on behalf of a plan to enforce section 515 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

"(A) the unpaid contributions,

"(B) interest on the unpaid contributions,

"(C) an amount equal to the greater of—

"(i) interest on the unpaid contributions, or

"(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

"(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

"(E) such other legal or equitable relief as the court deems appropriate. "For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of the Internal Revenue Code of 1954." 94 Stat. 1295, 29 U. S. C. § 1132(g)(2).

[14] "Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation concerning claims and defenses *unrelated to the employer's promise* and the plans' entitlement to the contribu-

That history contains no mention of the employer's statutory duty to make postcontract contributions while negotiations for a new contract are being conducted.[15]    Thus, both the

tions.    This should not be the case.    Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously.    Sound national pension policy demands that employers who *enter into agreements* providing for pension contributions not be permitted to repudiate their *pension promises.*"    Committee Print, *supra* n. 12, at 44 (emphases added).

See also n. 15, *infra.*

[15] Petitioners rely on selected excerpts of legislative history, but none refers to the NLRA duty, and some actually tend to disprove petitioners' case.    Senator Williams, Chairman of the Senate Committee on Labor and Human Resources, remarked on the Senate floor that "[o]n this whole question of delinquent contributions and the withdrawal liability collection, the bill provides a direct and I suggest unambiguous cause of action under ERISA to a plan against a delinquent employer."    126 Cong. Rec. 20180 (1980).    This statement does not address the issue of the source of the employer's obligations.    Representative Thompson, Chairman of the House Education and Labor Committee, explained similarly that § 515 would provide "a direct, unambiguous ERISA cause of action to a plan against a delinquent employer."    *Id.,* at 23039.    He added:

"The public policy of this legislation to foster the preservation of the private multiemployer plan system necessitates that provision be made to discourage delinquencies and simplify delinquency collection.    *The bill imposes a Federal statutory duty to contribute on employers that are already obligated to make contributions to multiemployer plans.*    A plan sponsor that prevails in any action to collect delinquent contributions will be entitled to recover the delinquent contributions, court costs, attorney's fees, interest on the contributions owed and liquidated damages.    *The intent of this section is to promote the prompt payment of contributions and assist plans in recovering the costs incurred in connection with delinquencies.*"    *Ibid.* (emphases added).

Petitioners add the emphases in their brief, but even the highlighted sentences do not speak to the issue of the source of an employer's obligations.

In fact, parts of Representative Thompson's statement not excerpted by petitioners tend to disprove their case.    At one point, he stated that "[f]ailure of employers to make *promised* contributions in a timely fashion imposes a variety of costs on plans."    *Ibid.* (emphasis added).    A bit later, he exclaimed that "[s]ound national pension policy demands that employers *who enter into agreements* providing for pension contributions not be per-

text and the legislative history of §§ 515 and 502(g)(2) provide firm support for the Court of Appeals' conclusion that this remedy is limited to the collection of "promised contributions" and does not confer jurisdiction on district courts to determine whether an employer's unilateral decision to refuse to make postcontract contributions constitutes a violation of the NLRA.[16]

---

mitted to *repudiate their pension promises.*" *Ibid.* (emphases added). Immediately following, he cited, "[i]n this regard," five judicial decisions, endorsing three and criticizing two. As respondent correctly explains, all five cases "concerned extraneous matters interposed as defenses to a clear contractual obligation arising during the term of the labor agreement." Brief for Respondent 18, n. 11. That is, none dealt with a statutory, post-contract obligation. See *Lewis* v. *Benedict Coal Corp.*, 361 U. S. 459 (1960) (union's promises not conditions precedent to employer's promise to pay royalties to fund; decision endorsed); *Lewis* v. *Mill Ridge Coals, Inc.*, 298 F. 2d 552 (CA6 1962) (employer owes contributions to fund under labor agreement regardless of alleged failure of consideration; decision endorsed); *Huge* v. *Long's Hauling Co.*, 590 F. 2d 457 (CA3 1978) (employer owes contributions to fund under labor agreement regardless of alleged union antitrust violation and unfair labor practices; decision endorsed); *Western Washington Laborers-Employers Health & Security Trust Fund* v. *McDowell*, 103 LRRM 2219 (WD Wash. 1979) (failure of union to achieve majority status relieves employer of obligation to contribute under prehire agreement; decision criticized); *Washington Area Carpenters' Welfare Fund* v. *Overhead Door Co.*, 488 F. Supp. 816 (DC 1980) (same), rev'd, 220 U. S. App. D. C. 273, 681 F. 2d 1 (1982), cert. denied, 461 U. S. 926 (1983). See also 126 Cong. Rec. 23288 (1980) (floor statement of Sen. Williams, identical to that of Rep. Thompson).

[16] Petitioners advance three unpersuasive arguments for the opposite conclusion. First, petitioners offer an alternative reading of what they deem § 515's "operative phrase," *i. e.*, "employer who is obligated to make contributions . . . under the terms of a collectively bargained agreement." Petitioners suggest that this language "can be read to refer to employers whose contributions are *defined and measured by the terms* of a collective-bargaining agreement, but whose obligation to contribute exists as a matter of law, independent of the contract. So read, Section 515 would require employers to adhere to all legal duties to make contributions to collectively-bargained plans." Brief for Petitioners 14 (emphasis in original). In other words, petitioners construe the word "under" to mean "defined and measured by," and read "obligated" to include both contractual

## III

Petitioners, supported by the United States as *Amicus Curiae*, advance two policy arguments for giving § 515 a broad construction that would include postcontract delinquencies. First, they argue that the reasons for giving a dis-

and statutory duties. But if Congress had meant to say this surely it could have done so more clearly; as written, § 515 plainly refers to obligations that themselves arise from either a "plan" or a "collectively bargained agreement."

Petitioners next point out that ERISA § 4301(b) provides that "[i]n any action under this section to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of section 515)." 94 Stat. 1263, 29 U. S. C. § 1451(b). Because of this "statutory linkage" between the remedies available for withdrawal and delinquency liability, petitioners contend, "it is appropriate and instructive in gleaning the intended scope of the Section 515 duty to examine how Congress defined the obligation to contribute for withdrawal liability purposes." Brief for Petitioners 21. Since withdrawal liability may arise from either a contractual or a statutory duty, see ERISA § 4212(a), n. 11, *supra*, petitioners conclude that delinquency liability must be similarly engendered.

It is easy to see that this argument is a false syllogism, for it reasons from the fact that Congress intended withdrawal and delinquency liability to have similar *remedies* to the erroneous conclusion that withdrawal and delinquency liability are themselves equivalent because both originated in contractual and statutory duties. As we have explained in the text, though, § 4212(a) actually cuts against petitioners, since it makes clear that while withdrawal liability may arise from both contractual and statutory duties, § 515 provides only for a contractual origin for delinquency liability.

Finally, petitioners maintain that if § 515 "were read to apply only to obligations imposed by collective bargaining agreements, the section would be entirely duplicative of Section 301 of the LMRA, 29 U. S. C. § 185, which creates a federal cause of action for the breach of such contracts." Brief for Petitioners 24. But, as respondent points out, "this argument conveniently ignores the specific purpose of Section 515." Brief for Respondent 22. That is, the new § 502(g)(2) remedies of mandatory prejudgment interest, liquidated damages equal at least to that interest, and attorney's fees and costs, plus such other relief as the court deems appropriate, are indeed "the potent new weapon previously unavailable to plans under" § 301 of the LMRA. Brief for Respondent 23.

trict court jurisdiction of collection actions apply to post-contract delinquencies as well as those arising during the term of the contract and that it is unwise to leave a "gap" in the enforcement scheme. Second, they argue that the remedies available in NLRB proceedings are inadequate.

Our principal reason for rejecting these arguments is our conviction that Congress' intent is so plain that policy arguments of this kind must be addressed to the body that has the authority to amend the legislation, rather than one whose authority is limited to interpreting it. We nevertheless note that there are countervailing policy arguments that make it highly unlikely that the limited reach of the statute is the consequence of inadvertence rather than deliberate choice.

With respect to the asserted "gap" in the enforcement scheme, three observations are pertinent. First, the incidence of the asserted gap is unknown. Presumably most employers who anticipate a continuing relationship with a union honor their obligations to preserve the status quo during negotiations for a new contract. If a new contract is ultimately signed, it should define the employer's obligations during the period subsequent to the expiration of the preceding contract; therefore, any delinquency during that period would be covered by § 515. On the other hand, if no new contract is ever signed, there is at least a possibility that an impasse had been reached either before, or only a short time after, the expiration of the old contract. The fact that this type of delinquency appears not even to have been called to the attention of Congress indicates that it may not be a problem of serious magnitude.[17]

Second, the issues that must be decided in a dispute over an employer's refusal to make any postcontract contributions are more complex than those that are presented in a simple collection action. Whereas it is entirely appropriate to

---

[17] Even petitioners concede that "most collection actions are brought to enforce an existing collective bargaining agreement." Brief for Petitioners 6; see *id.*, at 13.

award prejudgment interest or liquidated damages as a remedy for an employer's failure to make the payments specified in a contract, those remedies are problematic in cases in which there is a good-faith dispute over both the existence and the extent of the employer's liability. The question whether and when an impasse has been reached is often a matter of judgment based on an evaluation of the parties' bargaining history against standards that are imprecise at best.[18]

Third, whether an employer's unilateral decision to discontinue contributions to a pension plan constitutes a violation of the statutory duty to bargain in good faith is the kind of question that is routinely resolved by the administrative agency with expertise in labor law. There are situations in which district judges must occasionally resolve labor issues, but they surely represent the exception rather than the rule. In cases like this, which involve either an actual or an "arguable" violation of § 8 of the NLRA, federal courts typically defer to the judgment of the NLRB. See *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 245 (1959).[19]

Petitioners may be correct in contending that the remedies available in an NLRB proceeding are less effective than an ERISA action would be. Under ERISA they are entitled to attorney's fees, prejudgment interest, and liquidated dam-

---

[18] See n. 5, *supra.* Other employer defenses that raise complex factual and legal questions may also be asserted. In this case, for example, respondent avers that "issues exist concerning the unions' waiver of bargaining rights and their failure to satisfy their statutory bargaining obligations under Section 8(b)(3) of the NLRA." Brief for Respondent 36 (footnote omitted).

[19] See n. 4, *supra.* It is true, as petitioners point out, that district courts may find it necessary to decide whether an impasse occurred in withdrawal liability cases in which there is a dispute over the date of withdrawal. In such a proceeding, however, there would not normally be any claim that the employer was guilty of an unfair labor practice or that liquidated damages were mandated because the employer misjudged the impasse date.

ages, whereas the scope of relief available in an NLRB proceeding is often a matter of agency discretion. Moreover, an unfair labor practice charge must be filed within a 6-month period and the general counsel has discretion to refuse to issue a complaint if she is not persuaded that the charge has merit or is of sufficient importance to justify prosecution. Finally, the employer and the union may enter into a settlement that either reduces, or even might waive, the employer's postcontract obligations to contribute to the pension fund.

But these asserted defects in petitioners' labor law remedy are characteristic of all unfair labor practice proceedings before the NLRB. If the labor legislation were simply repealed, *in toto*, petitioners would have no basis whatsoever for claiming that an employer had any duty to continue making contributions to a fund after the expiration of its contractual commitment to do so. The duty that does exist is simply a consequence of a broader labor law duty that was created to protect the collective-bargaining process. Unilateral changes in the terms and conditions of employment are prohibited, not to vindicate the interests that motivated the enactment of § 515 in 1980, but rather to carry out the purposes of the NLRA. The net effect of the labor law duties imposed on employers by that legislation provides a substantial benefit to ERISA plan trustees, but Congress has not provided them with a unique and preferred procedure for obtaining redress for an employer's violation of its duty to bargain with the union.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.