*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0371p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND, and
HOWARD MCDOUGALL, Trustee,
                *Plaintiffs-Appellants,*

    *v.*

INTERNATIONAL COMFORT PRODUCTS, LLC,
                *Defendant-Appellee.*

No. 08-5949

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 07-00383—Aleta Arthur Trauger, District Judge.

Argued: March 10, 2009

Decided and Filed: October 23, 2009

Before: KETHLEDGE and WHITE, Circuit Judges; POLSTER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** John Joseph Franczyk, Jr., CENTRAL STATES LAW DEPARTMENT, Rosemont, Illinois, for Appellants. Lee T. Polk, BARNES & THORNBURG LLP, Chicago, Illinois, for Appellee. **ON BRIEF:** John Joseph Franczyk, Jr., Anthony E. Napoli, CENTRAL STATES LAW DEPARTMENT, Rosemont, Illinois, for Appellants. Lee T. Polk, BARNES & THORNBURG LLP, Chicago, Illinois, Bart A. Karwath, BARNES & THORNBURG LLP, Indianapolis, Indiana, for Appellee.

    KETHLEDGE, J., delivered the opinion of the court, in which POLSTER, D. J., joined. WHITE, J. (pp. 11–12), delivered a separate concurring and dissenting opinion.

_____

[*] The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

1

———————————

**OPINION**

———————————

KETHLEDGE, Circuit Judge.  Central States, Southeast and Southwest Areas Pension Fund, and Howard McDougall, Trustee (collectively, the "Fund") appeal the district court's grant of summary judgment to International Comfort Products, LLC ("ICP") with respect to the Fund's claims for withdrawal liability under the Multiemployer Pension Plan Amendments Act ("MPPAA" or the "Act"), 29 U.S.C. §§ 1381 *et seq*., and for breach of contract.  We affirm as to the latter claim.  The principal question presented as to the former is whether an entity need be *contractually* obligated to contribute to a pension fund, as opposed to obligated under applicable labor-management relations law, in order to be an "employer" for purposes of the MPPAA. Relying upon authority from other circuits, the district court held that the obligation must be contractual.  We respectfully disagree with that authority, and thus vacate and remand as to the MPPAA claim.

I.

A.

ICP is a Delaware corporation that, during the period relevant to this case, manufactured heating and cooling products at a facility in Lewisburg, Tennessee.  (We refer to ICP's predecessor entities also as "ICP").  In 1971, ICP entered into an agreement with Top Transportation Services, Inc. ("Top"), under which Top agreed to provide ICP with truck drivers for its Lewisburg operations.  Under the agreement, Top paid the drivers' salaries and benefits, and then sought reimbursement for those costs, among others, from ICP.  Accordingly, the relevant version of the agreement—executed in 1992 (the "Agreement")—provided that, on a weekly basis, "[Top] shall bill [ICP] its actual costs and expenses of operations hereunder . . . .  Such costs and expenses shall include, but not be limited to, direct wages, salary payments, payroll taxes and necessary

fringe benefits, insurance and administration applicable to the operations." Agreement ¶ 3.

The Agreement also provided that Top "will . . . handle all labor relations and the negotiating of union contracts and shall enter into any and all labor contracts covering the drivers who are its drivers and are in the service of [ICP]." *Id*. ¶ 2. Per that provision, Top, but not ICP, was a signatory to collective bargaining agreements with Local Union No. 327 of the International Brotherhood of Teamsters. Those agreements required Top to make contributions to the Fund—which is a "multiemployer pension plan" as defined by the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(37)—on behalf of the drivers. During all periods relevant here, Top invoiced ICP for Top's contributions to the Fund, and ICP then reimbursed Top those amounts.

In February 2002, ICP terminated its agreement with Top, which in turn ceased all operations the following month. That cessation triggered withdrawal liability under the MPPAA, which the Fund assessed to be in the principal amount of $570,694.35. In letters dated April 30, 2002, the Fund demanded payment of the assessment from both Top and ICP. Top never paid the assessment—it was by then a defunct entity—but it did invoice ICP for the assessment amount. ICP paid neither the assessment nor the invoice.

The Fund sued Top in May 2003 and obtained a default judgment for the assessment amount that July. Top never paid the default judgment. In February 2005, however, Top executed an assignment of its rights under the Agreement to the Fund. The Fund thereafter brought this action against ICP, asserting that ICP owed withdrawal liability under the MPPAA and that ICP breached its Agreement with Top—in whose shoes the Fund purported to stand—when it failed to pay Top's invoice for the assessment amount. The district court eventually granted summary judgment to ICP with respect to all of the Fund's claims.

This appeal followed.

II.

We review *de novo* a district court's decision granting summary judgment. *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004).

A.

1.

We turn first to the Fund's claim under the MPPAA. "Congress passed the MPPAA as an amendment to ERISA in order to protect multi-employer pension plans from the financial burdens that result when one employer withdraws from a multi-employer plan without first funding uncovered liabilities of the plan attributable to the employer." *Carriers Container Council, Inc. v. Mobile S.S. Assoc. Inc.-Int'l Longshoreman's Ass'n*, 896 F.2d 1330, 1342 (11th Cir. 1990). The Fund asserts its claim against ICP under § 1381(a) of the Act, which provides: "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." Only an "employer," therefore, can be subject to withdrawal liability under the MPPAA.

"The MPPAA does not itself contain a definition of the word 'employer[,]'" *Carriers*, 896 F.2d at 1342, which has made the task of constructing one unavoidable for the courts. All of the circuits to have addressed the issue, however, agree upon a common definition. That definition is "drawn from Title I of ERISA[,]" *id.* at 1343, whose definitions "do not apply elsewhere in the Act of their own force," but "may otherwise reflect the meaning of the terms defined as used in other Titles[.]" *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 371 n.14 (1980). Title I of ERISA defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan[.]" 29 U.S.C. § 1002(5). Adapting that definition to the MPPAA context, four circuits have held that the term "employer," for purposes of the Act, means "a person who is *obligated to contribute* to a plan either as a direct employer or in the interest of an employer of the plan's

participants." *Korea Shipping Corp. v. New York Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Trust Fund*, 880 F.2d 1531, 1537 (2d Cir. 1989) (emphasis added); *see also Carriers*, 896 F.2d at 1343 (same); *Seaway Port Auth. of Duluth v. Duluth-Superior ILA Marine Ass'n Restated Pension Plan*, 920 F.2d 503, 507 (8th Cir. 1990) (same); *Central States, S.E. and S.W. Areas Pension Fund v. Central Transport, Inc.*, 85 F.3d 1282, 1287 (7th Cir. 1996) (same).

This definition furthers the Act's purposes by "prevent[ing] a contributor to a plan from withdrawing its support without covering its share of unfunded liabilities." *Carriers*, 896 F.2d at 1343. The definition is also consistent with the structure of the Title I definition of employer. The Title I definition is different in kind from "the common law definition, which looks for direct employer-employee relationships (e.g., direct supervision, direct payment)." *Id.* Under Title I, the focus is instead upon the entity's "relation to an employee *benefit plan*[.]" 29 U.S.C. § 1002(5) (emphasis added). And we agree that the relevant relation, for purposes of determining withdrawal liability under the MPPAA, is whether the entity had an obligation to contribute to the plan in the first place. Like the other circuits, therefore, we hold that "the contributing obligor definition drawn from Title I applies to the term 'employer' in section 1381(a)." *Carriers*, 896 F.2d at 1343.

2.

"Although we now have a definition of employer, we still must determine what that definition means[.]" *Seaway*, 920 F.2d at 508. And there we respectfully part company with several of our sister circuits. The Ninth Circuit has held, without explanation or citation to authority, that "[t]he word 'employer' describes one who was a *signatory* employer with respect to the plan." *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for N. California*, 859 F.2d 808, 813 (9th Cir. 1988) (emphasis added). The other two circuits to have addressed the issue—the Seventh and the Eighth—trace their holdings back to the Eighth Circuit's holding in *Seaway*. There, the court surveyed the fact patterns in five cases applying the contributing-obligor definition of employer, and

found "one fact common to all of the parties held subject to withdrawal liability: *they were contractually bound to make pension contributions*, either in collective bargaining agreements, general cargo agreements, or shipping association agreements." *Seaway*, 920 F.2d at 509 (emphasis in original). "Thus, applying the relevant case law," the court held that the entity at issue there was not an MPPAA employer because it had not signed any contracts "explicitly obligating it to make pension contributions." *Id.*

The Eighth Circuit reiterated its position in a case factually similar to this one, namely *Rheem Mfg. Co. v. Central States S.E. and S.W. Areas Pension Fund*, 63 F.3d 703 (8th Cir. 1995). There, the court cited the "one fact common" passage from *Seaway*, and proceeded directly to hold: "The nature of the obligation to contribute establishing an entity as an 'employer' for MPPAA purposes, therefore, is *contractual*, and the party who is signatory to a contract creating the obligation to contribute is the 'employer' for purposes of establishing withdrawal liability." *Id*. at 707 (emphasis added). The Seventh Circuit applied that same rule a year later—without any analysis of its merits, or even expressly adopting it—in *Central Transport*, 85 F.3d at 1287. The Seventh Circuit thereafter expressly adopted that rule—but again without analysis of its merits—in *Transpersonnel, Inc. v. Roadway Express, Inc.*, 422 F.3d 456, 460 (7th Cir. 2005). Thus, in the Seventh, Eighth, and Ninth Circuits, an entity's obligation to contribute must be "created by contract" in order for the entity to be an employer under the MPPAA. *Id*.

For several reasons, however, we respectfully disagree with that rule. As an initial matter, the rule's foundation, as demonstrated above, is merely the *Seaway* court's observation that, in five other cases where an entity was deemed an MPPAA employer, the entity's obligation to contribute was contractual in nature. With the exception of the Ninth Circuit's unsupported declaration in *H.C. Elliott*, however, none of the cases surveyed in *Seaway* held, or even intimated, that a contractual obligation to contribute is the *only* such obligation sufficient to trigger employer status under the Act. Those cases merely happened to involve contractual obligations. The Eleventh Circuit's careful opinion in *Carriers* is an example: The court found that, under certain contracts,

the subject carriers were obligated to contribute to the subject plan; and thus the court held straightaway that the carriers "are subject to withdrawal liability" under the Act. 896 F.2d at 1344. And having had so held, the court had no reason even to consider, much less adopt, the "contract-only" limitation thereafter inferred in *Seaway*. Thus, at most, the surveyed cases merely suggest that contractual obligations might be the most *common* type, and not the *only* type, of obligation to contribute among MPPAA employers. And even then, five cases is not much of a sample size.

More fundamentally, *Seaway* and its progeny take the courts' exercise in interstitial lawmaking a definition too far. It is true enough that the definition of employer for purposes of the MPPAA was left for the courts to construct. But the definition thus constructed asks whether the entity has an "obligation to contribute" to a plan; and *that* term *is* expressly defined by the MPPAA. Title 29 U.S.C. § 1392(a) provides:

> (a) "Obligation to contribute" defined
>
> For purposes of this part, the term "obligation to contribute" means an obligation to contribute arising—
>
> (1) under one or more collective bargaining (or related) agreements, *or*
>
> (2) *as a result of a duty under applicable labor-management relations law*, but does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions.

(Emphasis added.)

Thus, rather than "apply the relevant case law," as in *Seaway*, our task should be simply to apply the statute. In § 1392(a) Congress has made unmistakably clear that, "[f]or purposes of" Part 1 of the MPPAA—which means for *all* such purposes, including a determination of withdrawal liability under § 1381, found in Part 1—an obligation to contribute to a plan may arise not only from a contract, but also from "applicable labor-

management relations law[.]" 29 § U.S.C. 1392(a)(2). That definition stands before us as clear as day. And it is *that* definition—rather than one constructed in the dim light of common-law inference—that we are bound to apply.

The Supreme Court has specifically held as much. In *Laborers Health and Welfare Trust Fund for N. California, et al. v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539 (1988)—a case apparently overlooked by the courts adopting the contract-only definition of contributing obligor—the Supreme Court directly addressed the meaning of "obligation to contribute" for purposes of Part 1 of the MPPAA. Observing that withdrawal liability "arises when an employer ceases to have an 'obligation to contribute' to the plan[,]" the Court declared: "That term is defined for the purposes of the withdrawal liability portion of the statute in language that *unambiguously includes* both the employer's contractual obligations *and any obligation imposed by the NLRA* [which the Court equated with applicable labor-management relations law]." *Id.* at 545-46 (emphasis added). Adding a double-knot for good measure, the Court stated that the § 1392(a) "definition is significant because it demonstrates that Congress was aware of the *two different sources of an employer's duty to contribute* to covered plans." *Id.* at 546 (emphasis added); *see also id.* at 549 n.16 ("withdrawal liability may arise from *either* a contractual duty *or* a statutory duty, see [§ 1392(a)]") (emphasis added).

The mere accumulation of contrary precedent in three other circuits does not, in our view, give us license to disregard the plain language of § 1392(a) or the Supreme Court's equally plain interpretation of it. *Cf. In re Sealed Case*, 310 F.3d 717, 725-27 (FISA Ct. Rev. 2002) (describing, and rejecting, a similar snowballing of precedent unconnected to the "*actual* statutory language" at issue) (emphasis in original). If an obligation to contribute is the touchstone of employer status under the MPPAA—and we agree that it is—then the dictates of the statute and Supreme Court alike compel the conclusion that employer status may arise from not only a contractual obligation, but also an obligation "under applicable labor-management relations law[.]" 29 U.S.C. § 1392(a)(2).

The Fund has contended throughout this litigation that ICP had the latter obligation. The district court did not reach that contention, however, because it followed *Seaway* and thus considered only whether ICP had a contractual obligation to contribute to the Fund. Per our holding today, we vacate the court's judgment with respect to the Fund's MPPAA claim, and remand for a determination whether ICP had an obligation to contribute to the Fund "under applicable labor-management relations law[.]" *Id.* The question whether that determination can be made only by the National Labor Relations Board, as ICP suggests in its brief, we leave for the district court to answer in the first instance.

## B.

The Fund's claim for breach of contract is more easily handled. The claim rests on two grounds. First, the Fund argues that the subject withdrawal liability was a cost of Top's operations—it does, after all, represent essentially an underpayment of Top's obligation to contribute to the Fund during the relevant period of Top's operations—and that ICP therefore owes Top (and the Fund itself, as Top's assignee) the amount of the liability. ICP counters, and the district court agreed, that a liability which by definition arises upon the *cessation* of operations cannot be a "cost" of them. We need not resolve that particular dispute, however, because the Agreement obligates ICP to reimburse Top only for Top's "*actual* costs" of operation, Agreement ¶ 3; and costs never paid are not actual. Top never paid any withdrawal liability, so it was not entitled under the Agreement to seek reimbursement for the assessed amount. And thus so too neither is the Fund.

Second, the Fund argues that, under the Agreement's indemnification clause, ICP is obligated to indemnify Top (and thus again the Fund as its assignee) for the amount of Top's withdrawal liability. *See* Agreement ¶ 5. We entirely agree with the district court that, when read as a whole, this section of the Agreement required ICP to indemnify Top for "vehicle liability"—basically, liability arising from trucking accidents—rather than withdrawal liability under the MPPAA.

The district court's judgment with respect to the Fund's claim for breach of contract is affirmed. The court's judgment with respect to the Fund's claim under the MPPAA is vacated and remanded for proceedings consistent with this opinion.

---

**CONCURRING AND DISSENTING**

---

WHITE, Circuit Judge, concurring and dissenting. I join in the majority opinion except for section II.B. I would reverse and remand the contractual claim based on § 3 of the Agreement.[1] Unlike the majority, I do not interpret the phrase "actual costs and expenses of operation" to unambiguously provide that "costs" for which Top became liable as the result of its operations under the contract with ICP, but did not pay, are not "actual costs."

The word "actual" means "real." In this context, "real" or "actual" could mean the actual amount of the costs and expenses as contrasted with the actual amount plus a percentage markup for services, or an additional markup for overhead. This is a common usage of the term actual. For example, a provision of the Bankruptcy Code allows court-appointed trustees of bankrupt estates to recoup "actual, necessary expenses." 11 U.S.C. § 330(a)(1)(B). Federal courts interpreting that language have distinguished "actual" expenses not from unpaid expenses, but from "estimated" expenses, as well as from general overhead expenses not attributable to any one account. *See generally,* James Lockhart, Annotation, *What Expenses Qualify for Reimbursement Under Bankruptcy Code Provision Allowing Reimbursement to Trustees, Examiners, and Professional Persons for Actual, Necessary Expenses (11 U.S.C.A. § 330(a)(1)(B))*, 169 A.L.R. Fed. 197 (2001).

Absent evidence of an alternate meaning between the parties, a reasonable interpretation of the phrase "actual costs and expenses" in the Agreement is that it served to make similar distinctions as those in other business interactions, and not to disqualify incurred but unpaid liabilities. *Cf. In re Washington Mfg. Co.*, 101 B.R. 944, 956

---

[1] I concur in the affirmance of the district court's grant of summary judgment dismissing plaintiffs' contract claim based on § 5 of the Agreement.

(Bankr. M.D. Tenn. 1989) (stating that "actual, necessary expenses" are expenses that are "incurred").

Further, the fact that withdrawal liability is not mentioned in the contract is not dispositive. The contract clearly provided that costs and expenses shall include, but not be limited to, the enumerated items. It is undisputed that over the course of the thirty-year relationship, Top billed ICP for, and ICP paid, the ongoing pension cost and expense. Further, ICP and Top visited the issue in 1994, when ICP cut back on the number of drivers supplied by Top. At that time, Top informed ICP of its potential withdrawal liability. ICP responded that it had obtained an opinion from counsel that "no liability will be incurred by [ICP] as a result of the downsizing." Although the district court interpreted this as ICP's assertion that withdrawal liability was not an obligation of ICP, it can also be understood as a statement that ICP believed that the anticipated downsizing would not trigger withdrawal liability, and a tacit acceptance of the underlying assertion that ICP might have withdrawal liability under the Agreement under different circumstances. Indeed, it is not asserted that the downsizing triggered such liability. If it had, no doubt Top would have billed ICP.

Because § 3 of the Agreement is not unambiguous as applied to this situation, and the surrounding circumstances create a genuine issue of material fact as to ICP's and Top's intent, I would reverse the grant of summary judgment and remand for further proceedings on this issue as well.