**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 27, 2012

No. 11-40454

Lyle W. Cayce
Clerk

GARY SAWYER; DOUG KEMPF; PETER BARNABA, SR.; GEOFF
RORREV; TIM GREGORY; ET AL,

Plaintiffs - Appellants

v.

E I DUPONT DE NEMOURS & CO,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before DeMOSS, CLEMENT, and ELROD, Circuit Judges.

PER CURIAM:

The original opinion in this case was filed on April 20, 2012.[1] Because this case involves important and determinative questions of Texas law as to which there is no controlling Texas Supreme Court precedent, the panel unanimously withdraws the previous opinion and substitutes the following certified questions to the Supreme Court of Texas.

---

[1] *Sawyer v. E. I. du Pont de Nemours & Co.*, 678 F.3d 379 (5th Cir. 2012).

No. 11-40454

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF TEXAS, PURSUANT TO ARTICLE 5, SECTION 3-C OF THE TEXAS CONSTITUTION AND RULE 58 OF THE TEXAS RULES OF APPELLATE PROCEDURE.

TO THE SUPREME COURT OF TEXAS AND HONORABLE JUSTICES THEREOF:

## I. STYLE OF THE CASE

The style of the case in which certification is made is Gary Sawyer; Doug Kempf; Peter Barnaba, Sr.; Geoff Rorrev; Tim Gregory; et al. v. E I DuPont De Nemours & Co., Case No. 11-40454, in the United States Court of Appeals for the Fifth Circuit, on appeal from the United States District Court for the Southern District of Texas, Galveston Division. Federal jurisdiction is based on diversity of citizenship.

## II. STATEMENT OF THE CASE

Appellants are sixty-three former employees of E. I. du Pont de Nemours and Company ("DuPont") who worked in the Terathane Products Unit at the company's manufacturing facility in La Porte, Texas. In February 2002, DuPont announced plans to spin off a portion of its operations to form a wholly owned subsidiary to be known as DuPont Textiles and Interiors ("DTI"). The Terathane Unit was one of the units slated to be transferred to DTI, and was the only unit being transferred from the La Porte facility.

The mechanics and operators at the La Porte facility, including those in the Terathane Unit, were represented by Local 900C of the International Chemical Workers Union Council ("Union") and were employed under a single collective bargaining agreement ("CBA") between DuPont and the Union. The

CBA contained a section entitled "Discharge or Disciplinary Suspension," which stated: "The PLANT agrees that no employee will be discharged or given a disciplinary suspension except for just cause." This section also included a detailed grievance procedure whereby fired employees could contest their termination as "an unjust discharge." In a different section entitled "Scope and Life of Agreement" the CBA provided that the "Agreement shall continue in full force and effect until terminated by either party with at least sixty (60) calendar days' notice in writing." The CBA also created a seniority system for the covered employees. Of the sixty-three appellants, fifty-nine were mechanics or operators in the Terathane Unit and were covered by the CBA when they worked for DuPont ("covered appellants"). The other four appellants, Jesse Blancas, James Svoboda, Jessie Lloyd, and Tracy Hedrick-Thomas, were administrative staff or laboratory technicians in the Terathane Unit and were not covered by the CBA ("non-covered appellants").

In September 2002, DuPont management and the Union began negotiations on how to handle the labor aspect of the Terathane Unit separation. Because DTI would be an independent legal entity, employees who transferred to DTI with the Terathane Unit would no longer be employed by DuPont. However, the CBA's seniority system gave employees with higher seniority the right to transfer to other units at the La Porte facility. This raised the possibility that some of the Terathane Unit employees would exercise that right in order to stay with DuPont when the Terathane Unit transferred. If that happened, DuPont would need to train new operators for the Terathane Unit and could have been forced to lay off lower seniority employees in other units at the plant. DuPont considered exercising its right to cancel the plant-wide CBA and bargaining for two new CBAs, one between the Union and DTI for the Terathane Unit employees, and another between the Union and DuPont for the rest of the La Porte employees, but decided against that option out of concern that it would

No. 11-40454

create tension between management and labor and increase the risk of a strike.

DuPont and the Union eventually agreed on a two-phase process. During the first phase, the Terathane Unit employees would be allowed to choose whether to stay with DuPont or join DTI. The employees who stayed with DuPont would leave the Terathane Unit and transfer to another unit at the La Porte facility. Those who joined DTI would remain with the Terathane Unit and would be covered by a new CBA identical to their existing CBA, providing the same pay and benefits they received at DuPont. The second phase consisted of another round of negotiations between management and the Union, which would only be necessary if a significant number of Terathane Unit employees decided to stay with DuPont. The employees were required to make their decision between November 15 and December 16, 2002.

Between October and December 2002, DuPont management began holding meetings with the Terathane Unit employees to explain the details of the separation arrangement. These meetings were led by Phil Anderson, the Terathane Unit manager, Roslyn Cacciotti, the Terathane Unit human resources manager, and Johnny Ponder, a Terathane Unit first line supervisor. The Terathane Unit employees expressed concerns at these meetings that DuPont might sell DTI to a third party. Many of the employees had worked for DuPont for a long time and wanted to protect their compensation and retirement packages by remaining a part of the DuPont family. Anderson's immediate supervisor, Sonny Matocha, testified that he and Anderson discussed DuPont's intent to either sell DTI or spin it off in an IPO. Even if DuPont opted for the IPO, Anderson testified that he understood at the time that DuPont intended to entirely divest itself of 100% of the DTI shares so that DuPont would not in any way own or control DTI.

Appellants allege that they were assured by Anderson, Cacciotti, and Ponder that DTI would remain a part of DuPont. The parties agree that Phil

4

No. 11-40454

Anderson told the employees that a sale of DTI was "highly unlikely." Anderson used charts and graphs to support his opinion that DTI was too large to be sold because it was bigger than any of its potential buyers. He often explained, by way of analogy, that "we're the whale, and fish don't eat whales." Employees also testified that Anderson told them individually that DuPont would still own or control DTI when they retired in fifteen years.

By the end of Phase one, virtually all of the Terathane Unit employees had signed agreements voluntarily transferring to DTI. The new CBA between DTI and the Union became effective on February 1, 2003. On April 14, 2003, DuPont announced that it was in the early stages of negotiations for the sale of DTI with a third party. The third party turned out to be Koch Industries ("Koch") and the sale was finalized roughly a year later on May 1, 2004. It was later revealed that DuPont and Koch discussed a possible sale of DTI as early as June 2002. Appellants allege that their "pensions, pay, and benefits materially changed in a negative way" after Koch acquired DTI.[2]

On November 7, 2006, Appellants filed suit against DuPont in the United States District Court for the Southern District of Texas on the basis of diversity jurisdiction. Appellants' claims were not based on any alleged violation of the CBA between the Union and DuPont or the CBA between the Union and DTI.[3] Rather, Appellants sought to vindicate their rights under Texas law, asserting state law claims for fraud, fraudulent inducement, and fraud by omission. They alleged that DuPont misrepresented that it would retain ownership of DTI and in doing so fraudulently induced them to terminate their employment with DuPont and accept employment with DTI.

---

[2] The Terathane Unit employees received the same pay and benefits at DTI that they received at DuPont until DTI was purchased by Koch.

[3] The Union has not been a party to this litigation.

5

No. 11-40454

Shortly after the complaint was filed, DuPont filed two motions to dismiss, arguing that Appellants' claims were preempted by the National Labor Relations Act ("NLRA") or, alternatively, by the Employee Retirement Income Security Act ("ERISA"). The district court denied DuPont's motion but certified an interlocutory appeal. On February 15, 2008, this court issued an opinion, authored by Judge King, holding that Appellants' fraud claims were sufficiently separate and distinct from the controversies covered under the NLRA and ERISA that they were not preempted by either statute. *See E. I. DuPont De Nemours & Co. v. Sawyer*, 517 F.3d 785 (5th Cir. 2008). DuPont later filed a motion to dismiss for failure to state a claim upon which relief could be granted. On October 22, 2008, the district court granted DuPont's motion as to Appellants' fraud by omission claim, but denied the motion as to Appellants' fraud and fraudulent inducement claims.

DuPont eventually filed several motions for summary judgment arguing, inter alia, that Appellants were at-will employees when they worked for DuPont and were unable to assert fraud claims against DuPont for loss of their employment. The district court agreed. On February 3, 2011, the district court issued two opinions holding that both the covered and non-covered appellants were at-will employees when they worked for DuPont and were therefore unable to assert fraud claims against the company under Texas law. Appellants timely appealed to this court.

### III. LEGAL ISSUES

The resolution of this case turns on two questions of Texas law, neither of which has been directly addressed by the Supreme Court of Texas: (1) whether Texas law allows at-will employees to bring fraud claims against their employers for loss of their employment; and (2) if not, whether a CBA that limits the employer's ability to discharge its employees only for just cause, but can be

No. 11-40454

canceled anytime by either party with notice, overcomes Texas's strong at-will presumption thereby enabling employees covered by the CBA to bring Texas fraud claims against their employer for loss of their employment.

Employment in Texas is presumed to be at-will. *Midland Judicial Dist. Cmty. Supervision & Corr. Dep't v. Jones*, 92 S.W.3d 486, 487 (Tex. 2002). An at-will employee may be discharged for "good cause, bad cause, or no cause at all." *Id.* (quoting *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998)). To overcome the at-will presumption "the employer must 'unequivocally indicate a definite intent . . . to be bound not to terminate the employee except under clearly specified circumstances.'" *Id.* (quoting *Brown*, 965 S.W.2d at 502); *see also Talford v. Columbia Med. Ctr. at Lancaster Subsidiary, L.P.*, 198 S.W.3d 462, 464 (Tex. App.—Dallas 2006, no pet.).

The Courts of Appeal in Waco, San Antonio, and Houston have addressed the first of the above questions and have concluded that Texas law does not permit at-will employees to bring fraud claims against their employer for loss of their employment. *See PAS, Inc. v. Engel*, 350 S.W.3d 602, 612–13 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *Cahak v. Rehab Care Group, Inc.*, No. 10-06-00399-CV, 2008 Tex. App. LEXIS 6011, at *7 (Tex. App.—Waco Aug. 6, 2008, no pet.) ("An at-will employee's claim for fraudulent inducement is . . . precluded as a matter of law."); *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 381 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("This court has held that an at will employee is barred from bringing a cause of action for fraud against his employer based upon the employer's decision to discharge the employee." (internal quotations omitted)); *Halper v. Univ. of the Incarnate Word*, 90 S.W.3d 842, 847 (Tex. App.—San Antonio 2002, no pet.).[4] Though the precise scope and

---

[4] The issue was also discussed in the following cases: *Brown v. Swett & Crawford of Tex., Inc.*, 178 S.W.3d 373, 379 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *Crow v. Rockett Special Util. Dist.*, 17 S.W.3d 320, 329–30 (Tex. App.—Waco 2000, pet. denied), *overruled on*

basis for the rule have not been thoroughly developed, it appears to rest on the notion that at-will employees have no guarantee of future employment and therefore cannot detrimentally rely on assurances of future employment. *See e.g., Engel*, 350 S.W.3d at 612–13. Because detrimental reliance is an element of fraud, the reasoning goes, an employee's at-will status precludes a fraud claim as a matter of law. *See id.*

The Beaumont Court of Appeals, however, has held otherwise. In *Offshore Petroleum Divers, Inc. v. Cromp*, 952 S.W.2d 954, 955 (Tex. App.—Beaumont 1997, pet. denied), the plaintiffs brought fraud claims alleging that their former employer misrepresented the nature of the jobs they would be performing. On appeal, the employer, citing the First Court of Appeals' decision in *Leach v. Conoco*, 892 S.W.2d 954, 960–61 (Tex. App.—Houston [1st Dist.] 1995, writ dism'd w.o.j.), argued that the plaintiffs were at-will employees and that their fraud claims were therefore barred. *Offshore Petroleum Divers*, 952 S.W.2d at 955. The Beaumont Court disagreed. It distinguished *Leach* on the basis that the alleged misrepresentations in that case were made while the plaintiff was an employee, while the misrepresentations in the case before the court were made before the plaintiffs were hired. *Id.* at 956. Despite the distinction, however, the Beaumont Court squarely held that "the cause of action for fraud, which encompasses misrepresentations made before employment, as well as those made during employment, is not barred by the employment at will doctrine."[5] *Id.*

If Texas law does prohibit fraud claims by at-will employees for loss of their employment, the question becomes whether the covered and non-covered

---

*other grounds by Binur v. Jacobo*, 135 S.W.3d 646, 651 n.11 (Tex. 2004); *Leach v. Conoco*, 892 S.W.2d 954, 960–61 (Tex. App.—Houston [1st Dist.] 1995, writ dism'd w.o.j.).

[5] The San Antonio Court of Appeals has interpreted the *Offshore Petroleum* case as establishing an exception allowing fraud claims by at-will employees when the claims are based on an employer's pre-employment misrepresentations. *See Halper v. Univ. of the Incarnate Word*, 90 S.W.3d 842, 847 (Tex. App.—San Antonio 2002, no pet.).

appellants were at-will for purposes of Texas law when they worked at DuPont. The panel has concluded, based on existing Texas Supreme Court precedent, that the non-covered appellants were at-will employees. The more difficult question is whether the covered appellants were at-will employees under Texas law when they worked for DuPont.

The covered appellants argue that they were not at-will because they were employed under a CBA that provided that they could not be discharged except for just cause, allowed grievance procedures to enforce these employment protections, and created a detailed seniority system that limited DuPont's ability to terminate employees in a force reduction situation. They argue that the just cause and seniority provisions constituted clear and specific restrictions limiting DuPont's ability to terminate their employment, thereby overcoming the Texas at-will presumption. DuPont argues that the covered appellants were at-will for purposes of Texas law because the CBA contained a provision allowing either party to cancel the agreement at anytime with 60 days' written notice, even though DuPont never in fact terminated the CBA. The covered appellants respond that this provision is typical in most indefinite term CBAs, simply providing for termination with the notice required by 29 U.S.C. § 158(d), and this does not transform all the CBA's protections into an at-will arrangement under Texas law.  Moreover, because neither party did in fact terminate the CBA, the covered employees always enjoyed the CBA's protections and federal law prohibited DuPont from firing them without just cause.

We did not find a Texas Supreme Court opinion addressing whether a CBA that limits an employer's ability to discharge its employees only for just cause, but that can be cancelled by either party with notice, overcomes Texas's at-will presumption.  We have also not found any case where an employee covered by just cause protections in a CBA was held to be at-will.

Some Texas appellate courts have held that term employment agreements that can be cancelled at anytime with notice create an at-will employment relationship. In *Hussong v. Schwan's Sales Enterprises*, 896 S.W.2d 320, 322 (Tex. App.—Houston [1st Dist.] 1995, no writ), the plaintiff sued his former employer for breach of an employment agreement. The agreement was for a fixed term of employment, which in Texas means that the employee is not at-will and can only be discharged for good cause. *Id.* at 322, 324–25; *see also Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 578 (Tex. App.—Houston [1st Dist.] 1992, no writ) ("When [a] contract of employment is for a term, as opposed to 'at will,' the employer has the burden of showing good cause for the discharge."). The agreement also included a provision allowing either party to cancel the agreement with 30 days' written notice. The court held that despite the employment agreement's good cause component, it established only an at-will employment relationship because it could be cancelled by either party at any time with notice. *Hussong*, 896 S.W.2d at 325.

The Fourteenth Court of Appeals' decision in *Curtis v. Ziff Energy Group, Ltd.*, 12 S.W.3d 114, 117–18 (Tex. App.—Houston [14th Dist.] 1999, no pet.) involved similar circumstances. The plaintiff in that case also sued his former employer for breach of an employment agreement. The agreement provided a one year term, but stated that either party could cancel the agreement anytime with 30 days' written notice. *Id.* at 116–17. The plaintiff argued that term employment contracts in Texas may only be only be terminated for good cause, and therefore that he was not an at-will employee. *Id.* at 117. As in *Hussong*, the court found that the employment agreement established only an at-will employment relationship because either party could terminate the agreement at any time with notice. *Id.* at 117–18; *see also McGee v. Abrams Tech. Servs.*, No. 01-06-00590-CV, 2008 Tex. App. LEXIS 1616, at *9 (Tex. App.—Houston [1st Dist.] Mar. 6, 2008, no pet.) ("A contract that contains a stated term of

employment but also contains an unambiguous voluntary termination clause does not 'unequivocally indicate' an intent to alter the at-will employment relationship."); *C.S.C.S., Inc. v. Carter*, 129 S.W.3d 584, 591 (Tex. App.—Dallas 2003, no pet.) ("A contract of employment for a term may still be at-will if the agreement allows termination for any reason.").

However, none of these cases dealt with a CBA. Unlike the above situations where the individual's employment could be terminated for any reason with notice, the covered employees in this case would not lose their jobs if the CBA between the Union and DuPont were terminated. Also, DuPont would have had to comply with various federal labor law requirements when terminating the CBA between itself and the Union. These requirements include offering to meet with the Union for the purpose of negotiating a new agreement and maintaining the status quo protections until DuPont and the Union's good-faith bargaining reached an impasse. *See, e.g.*, 29 U.S.C. § 158(a)(1), (a)(5), (d); *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539, 543 n.5 (1988); *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318 (1965). While DuPont could have begun the termination process at anytime by providing 60 days' written notice, it never did so, and therefore was unable to discharge the covered appellants except for just cause when they transferred to DTI.

Whether, and to what extent, the protections in this CBA affect an employee's ability to bring Texas fraud claims for loss of employment is a question best answered by the Texas Supreme Court.

## IV. QUESTIONS CERTIFIED

We hereby certify the following questions of law to the Supreme Court of Texas:

No. 11-40454

1. Under Texas law, may at-will employees bring fraud claims against their employers for loss of their employment?

2. If the above question is answered in the negative, may employees covered under a 60-day cancellation-upon-notice collective bargaining agreement that limits the employer's ability to discharge its employees only for just cause, bring Texas fraud claims against their employer based on allegations that the employer fraudulently induced them to terminate their employment?

We disclaim any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the questions certified.